JOHN H. SKEELS and ELLSWORTH SKEELS v. W. J. PORTER and EMERSON WALMER, Appellant.

**Real property:** FRAUDULENT REPRESENTATIONS. It is not essential to an action for misrepresentations in an exchange of properties that the party guilty of the deceit should receive any advantage, or should have colluded with the party benefited. The gravamen of the charge is that the plaintiff was deceived to his injury, not that defendant was benefited.

**Same:** SURVEY OF LAND: EVIDENCE. Where it appeared that the land in question was not in existence by reason of the fact that the township as surveyed never included such description, it was competent, in an action for misrepresentation of the land, for a surveyor who surveyed the township to state that it contained no land of that description, even though he did not apply the government rule of proportional measurement.

**Appeal:** ASSIGNMENT OF ERRORS: COURT RULES. On appeal the assignments of error should contain a brief and concise statement of so much of the facts as fully represent the errors and exceptions relied upon, referring to the lines and pages of the abstract, and the brief should contain under separate headings of each error relied on separately numbered propositions or points, without argument and with the authorities relied on in support thereof. An assignment of errors grouped in argument, containing no statement of facts, and which can only be understood by reference to various pages of the abstract, are not in compliance with the rules.

**False representations:** INSTRUCTIONS. An instruction in an action for false representations that if in answer to plaintiff's inquiries defendants, or either of them, knowingly made false replies with intent to deceive and did deceive plaintiff to his damage, they would be liable, but neither would be liable for representations of the other not made in his presence and hearing, was a correct statement of the law; although the court might well have added that unless what one said so referred to the other as to exact a response, unless concurred in, neither would be responsible for what was said by the other.

**Same.** It is no defense to an action for false representation in an exchange of lands, that the statements made by one defendant were not the sole reliance of plaintiff. If they exerted a material influence, though but one of several influences which, acting together, produced the desired result, it is sufficient.

**Same.** An instruction that statements made by defendants were competent, but should be considered only against the defendant making them, was not erroneous, as authorizing the jury to find against defendants on statements not made by them.

**Same:** DAMAGES: EVIDENCE. Evidence of the value of property given in exchange for that concerning which alleged misrepresentations were made is admissible on the question of damages for the fraud.

*Appeal from Linn District Court.*—F. O. ELLISON, Judge.

SATURDAY, FEBRUARY 14, 1914.

ACTION for damages because of deceit alleged to have been practiced by defendants resulted in a judgment against them. They appeal.—*Affirmed.*

*Randall, Courtney & Harding* and *Jamison, Smyth & Hann*, for appellant *Walmer*.

*G. M. Wilson* for appellant *W. J. Porter*.

*Remley & Remley* and *E. A. Johnson*, for appellees.

LADD, C. J.—The plaintiffs owned two lots in Belle Plaine and a lot in Lisbon, and on the 18th day of February, 1910, entered into an agreement with W. J. and Ethel A. Porter, by the terms of which they exchanged said lots to said Porter for the S. W. ¼ of section 6 in township 104 N. of range 65 W. of fifth P. M., Aurora County, S. D., containing 147.35 acres according to the government survey, more or less. Deeds were exchanged accordingly; but subsequently plaintiffs claim to have discovered that the land as above described had no existence, and in this action for damages allege that, to induce them to make the deal, defendants represented that the land was good, well located, on a road leading to the town of White Lake, that eighty acres were under cultivation, that the place was practically free from stone, and had only about five acres of low land, and was gently rolling, that the soil was black loam, with clay subsoil, and worth $35 per acre, and that those representations were false, and known to be such, in that the land as so described had no existence.

The conveyance of this land was made by the Porters; it being alleged that Walmer was interested as part owner, or as agent, and that he and Porter conspired to defraud 1. REAL PROPER- plaintiffs. The court, however, withdrew the TY: fraudulent issues raised on these allegations as to Wal- representa- tions. mer, and it is first contended that, because of the elimination thereof, the jury should have been directed to return a verdict in his favor. It is not essential in such an action that the person making the representation should have received any benefit or advantage from the deceit practiced, or that he should have colluded with the party benefited.

"The gravamen of the charge is that plaintiff had been deceived to his hurt, not that defendant has gained an advantage." *Busterud v. Farrington,* 36 Minn. 320 (31 N. W. 360); *Sigafus v. Porter,* 84 Fed. 430 (28 C. C. A. 443); *Hubbell v. Meigs,* 50 N. Y. 480; *Fisher v. Mellen,* 103 Mass. 503; 30 Cyc. 84.

Indeed, the law seems to deal less leniently with persons without interest misrepresenting than with those who, because of interest, are naturally prone to overestimate their own property, for the former are generally held responsible for false representations of value. *Medbury v. Watson,* 6 Metc. (Mass.) 246 (39 Am. Dec. 726). Walmer could have assisted Porter, or himself have accomplished the fraud, without being interested in the deal, or being Porter's agent, or without having colluded with him. He might have proceeded in the hope of sharing the plunder at a low price to his profit, which in fact he did by buying of Porter after the trade one of the houses at much less than its value. If, then Walmer knowingly, and to induce plaintiffs to exchange properties, falsely represented the land with intent thereby of defrauding them, he was liable for the resulting damages.

A review of the evidence will serve no useful purpose. It is enough to say that, though conflicting, it was sufficient to carry the issues to the jury.

II. One B. K. Watson testified to having surveyed the township in which the land was described as being located. He was an experienced surveyor, having been a deputy surveyor general of the United States many years, and was then county surveyor. The sole objection to his testimony seems to be that his survey was not according to the rules of the government land office, in that he did not apply the rule of "proportional measurements." He had no occasion to do so. He did measure from known and recognized monuments to ascertain the western boundary of the township, and especially

2. SAME: survey of land: evidence.

that of section 6, the southwest quarter of which Porter undertook to convey to plaintiffs. Beginning at the southeast corner of the township, he measured therefrom along the south line to the southwest corner thereof, and found the distance to be five miles, one hundred and thirty-four rods, and the distance from the corner between sections 31 and 32 to the southwest corner of the township thirty-six chains. He also measured the line a mile north, and found the width of the township to be five miles and one hundred and forty-three rods, and the distance from the corner common to sections 20, 29, 31, 32 to the west line of the township thirty-five and seventy hundredths chains. From the corner common to sections 17, 18, 19, 20, the distance to the west line was thirty-five and sixty-five hundredths chains, and from the corner common to 5, 6, 7, and 8 to the western line of the township thirty-one chains and fifty links. The latter line was run from the corner on the western boundary between sections 6 and 7 east to the corner on the eastern boundary, and the distance was five miles and one hundred and sixty-seven rods. These measurements were from recognized corners, and, according thereto, the west tier of sections in the township was approximately one-half mile wide.

The transcript of the original field notes of the township boundaries and section lines disclosed that, in subdividing the township in which the quarter section purported to lie, the deputy surveyor general first ran a line from the southeast corner of the township north on the east side to the first standard parallel, reaching it thirty chains five links "east of the corner to township 105 N., ranges 64 and 65 W.," and set a post in mound for corner of "township 104 N., ranges 64 and 65 W." A line was then run along the township line west six miles, setting stakes in mounds at intervals of forty and eighty chains. A random line was then run from the southwest corner east along the south line of the township to the one hundred and eight links south of the southeast corner, a distance of five miles and seventy-six chains and

sixty links. This was retraced to the southwest corner, and permanent corners located. Then the survey was run north to the first standard parallel, making corners at intervals of forty and eighty chains until the last, which was ninety-two and forty-three hundredths chains, and reaching that parallel at a point thirty-three chains sixteen links "east of the corner to township 105 N., ranges 65 and 66 W." The west tier of sections was then surveyed; the quarter corner post between sections 6 and 7 being set thirty-five and eighty-four hundredths chains from the township line, and the southeast corner of section 6, seventy-six and eighty-four hundredths chains east thereof. The line between sections 5 and 6 reached the standard parallel seven chains west of the quarter section corner on south boundary of section 32, township 105 N., range 65 W.

To determine the proper adjustment of the compass for subdividing the township, the east tier of sections of the township immediately west was then surveyed, commencing at the southwest corner of township 104 N., range 65, and reach the parallel in running line between sections 1 and 2 in township 104 N., range 66, "fourteen and forty-sixth hundredths chains east of the quarter section corner in south line of section 36, township 105 N., of range 66 W. of 5th principal meridian."

The notes then recite:

I find this closing fourteen and forty-six hundredths chains east of the quarter section corner, instead of about seven chains west of the same, as was expected from the field notes given on the diagrams of the exterior township boundaries. To discover and correct my error, if any, I examined the exterior lines. I had previously examined the ninth guide meridian, which is the line between ranges 66 and 67 west for the entire distance between townships 101 and 102, 103 and 104, and found it a true north line throughout and correct. I had also subdivided township 104 N., of range 67 W., and found my closing north as expected from the field notes furnished. I had previously run north between ranges 65 and 66,

townships 101 and 102, and found no section or quarter section corners whatever, but found the township corners established. The same range line between townships 103 was duly established from the corner to townships Nos. 103 and 104 N., ranges 65 and 66 W. I run north in exact prolongation of the preceding eighteen miles of line, and find all the corners in line established at forty and eighty chains up to and including the quarter section corner on line between sections 1 and 6. I prolong this line, and at 492.20 chains intersected the first standard parallel fourteen and forty hundredths chains E. of the quarter section corner in south line of section 31, township 105 N., range 65 W. fifth P. M., and twenty-four and sixty-three hundredths chains east of the old closing corner for township No. 104 N., ranges 65 and 66 W. I therefore, at the point of intersection, established a closing corner, and demolished the erroneous corner. This correction shows that my closing was correct.

This survey of Watson, with the plat exemplifying it, in connection with these field notes excludes all reasonable doubt as to the existence of west quarter sections along the township line. The southern boundary of section 6 was but thirty-one chains and fifty links in length according to his survey, and the width of the township but seven rods over five and one-half miles at that line. According to the field notes the quarter post was first set between sections 6 and 7, a distance of thirty-five and eighty-four hundredths rods east of the township line, and forty-one chains farther on for the southeast corner of section 6. But this last corner was some distance more than five miles west of the east boundary, so that the correction made, as appears from the field notes, located the township boundary line east of where the quarter corner on the line between 6 and 7 had been located. There seems no doubt, then, that no quarter corner on the east and west lines between the sections of the west tier in the township were ever established, but that under the government survey the section corners served such purpose, and that thereunder there were no northwest or southwest quarter sections in that tier of sections.

One Garver had received a patent from the government for the southeast quarter of section 6, and was in actual and undisputed occupancy ·up to the township boundary, along which there was a highway. This was not a case for the application of the doctrine of "proportionate measurements," as it plainly appears that the government had not sub-divided nor intended to subdivide the western tier of sections, but had caused the east to be surveyed as quarter sections, and eliminated the west quarter sections by the correction of the township boundary.

It is not a case of lost quarter corner calling for its location by proportionate measurements, but one where, according to the survey, the southeast quarter of the section, as laid out, includes all the land to the township line. It necessarily follows that there was no land under the description conveyed by Porter to plaintiffs.

III. Thirty-seven errors are assigned on rulings on the admissibility of evidence. These are "bunched" in argument, and can only be understood by referring from the brief points in which the grounds of complaint only are given to the assignment of error, which merely give the page of the abstract where the question, objection, and ruling may be found. Thus point 2 reads: "Under assignments of error Nos. 2, 9, 10, 21, 22, 33, and 34, we make the point that the question called for a conclusion of the witness, the operation of the witness' mind, and that the questions were therefore open to objection, and the objection, having been properly made, should have been sustained by the court." Turning to assignment 2, recites that "there was manifest error in the ruling of the court overruling the objection at line 12 on page 48 to the question at line 8 on page 48 for the reasons assigned in said objection." Assignment 9 is equally specific, referring to a ruling at line 27 on page 109 of the abstract; assignment 21 to another on page 128, and so on. In other words, to ascertain the rulings complained of in a single brief

3. APPEAL: assignment of errors: court rules.

point, it is necessary to go therefrom to seven different assignments of error, and from these to as many pages, lacking one, scattered through the abstract. Other brief points, except three, are in similar form.

With the repeal of the statute exacting the specific assignment of errors, disappeared the necessity of extreme particularity in stating the errors relied on for reversal. Nevertheless these should be stated with sufficient fullness and clearness in the brief to advise the court of the complaint made. Section 53 of the rules exacts "a brief and concise statement of so much of the facts as fully presents the errors and exceptions relied upon, referring to the lines and pages of the abstract." This does not mean that the evidence, contained in the abstract shall be repeated, but that the facts of the case be recited with sufficient fullness, and that only to indicate the bearing of the rulings complained of. Even when the sufficiency of the evidence to sustain the verdict or judgment is challenged, it is only necessary to recite in narrative form in the briefest way the facts especially pointing out the precise issue with respect to which, it is claimed, there is a failure of proof, and as to that directing attention to the evidence in greater detail. This has the merit of focusing the investigation on the very question involved. The rule further exacts that "the brief shall contain, under separate headings of each error relied on, separately numbered propositions or points, stated concisely, and without argument or elaboration, together with the authorities relied on in support of them." These rules were ignored by appellant in his argument, and, instead of presenting the precise errors relied on therein, and referring thereto, separately in the brief points, these could be found only by tracing them from the brief point through the assignments of errors to some place in the abstract. Notwithstanding this, we have examined each ruling to which exception is taken, and discover no reversible error, bunching all together in our decision after the manner of counsel in their argument.

IV. Much of the criticism of instructions has been disposed of. The fault found with instruction 5 is hypercritical, and without merit. The eighth instruction was correct in so far as it went. It directed the jury in substance that, if plaintiffs inquired of defendants or either of them in presence of the other concerning the land, and *both defendants* made false representations knowingly, and with intent to deceive, and did deceive, plaintiff into making the exchange to their damage, the defendants would be liable. Added thereto was the statement that "defendant Walmer would not be liable for any false statements or representations made by defendant Porter which were not made in his presence, and the defendant Porter would not be liable for any false representations or statements of defendant Walmer which were not made in his presence and hearing."

4. FALSE REPRE-
SENTATIONS:
instructions.

This is a correct statement of the law, though the court might have gone farther and said that, unless what one said so referred to the other as to exact a response, unless concurred in, neither was responsible for what was said by the other even in his presence. If they were not acting in concert or one for the other, neither was in any manner bound by what the other may have said in his presence, for, unless it in some way related to him, silence could not be construed as acquiescence even. It will be observed, however, that liability under the instruction can be predicated only on a finding that both defendants made false representations, and this was the rule laid down in all other instructions alluding to this phase of the case. There was no error.

The ninth instruction related to recovery against Porter only, and was a correct statement of the law. The tenth instruction relates to Walmer's liability, and the portion thereof criticized declares that, if plaintiffs relied on Walmer's representations, "or relied upon such representations in connection with similar representations made by defendant Porter at the same time,

5. SAME.

and in Walmer's presence," this would render Walmer liable
for damages occasioned by the false representations made by
him.  In other words, what Walmer said need not necessarily
have been the sole producing cause.  Such is the law.  *Dashiel
v. Harshman,* 113 Iowa, 283.

It was not essential to recovery that plaintiffs should
have relied exclusively on the representations of either de-
fendant, nor even that these should have been the principal
inducement to their change of situation.  "If they exerted
a material influence upon his mind, although constituted only
one of the several motives which, acting together, produced
the result, it is sufficient."  20 Cyc. 41; *Burr v. Wilson,* 22
Minn. 206; *Foley v. Holtry,* 43 Neb. 133 (61 N. W. 120).

The eleventh, and twelfth, and thirteenth instructions re-
late also to the liability of Walmer, and lay down the rules
in harmony with the recent decision of this court.  *Davis v.
Central Land Co.,* 162 Iowa, 269.

V. The court admitted evidence of conversations between
Porter and other witnesses not in Walmer's presence, and
also conversations with Walmer not in Porter's presence;
but appellant is mistaken in contending
6. SAME.        that the court in submitting the cause to the
jury did not point out how this evidence should be considered.
It was said in the seventeenth instruction: "Such statements
made by each defendant, and the statements made to each
defendant, is competent, and should be considered by you as
against the defendant making such statement, or to whom
they were made; but you should not consider them as against
the defendant who was not present when such statements were
made by the other defendant or to the other defendant."
This was certainly correct in so far as it went, and was not
subject to a wrong inference, as the court directed the jury
only to find against either defendant on representations made
by him.

The eighteenth instruction is criticized for that it allows
the jury to consider the value of the property exchanged for

the alleged land. The correctness of that ruling is demonstrated by *Vaupel v. Mulhall*, 141 Iowa, 365.

7. SAME: damages: evidence.

If there was any evidence received as to reports or rumors with regard to the shortage of land, it was subsequently excluded, and the jury cautioned not to consider the same.

In so far as correct, the instructions requested were included in those given. The record is without reversible error, and the judgment is—*Affirmed*.

EVANS, WEAVER, and PRESTON, JJ., concurring.