THE P. COX SHOE COMPANY v. A. A. ADAMS, F. O. ADAMS, Trustee, Defendants and Appellants; HILLIARD & TAYLOR, *et al.*, Cross Petitioners and Appellees, and RONEY & BERGER and E. H. COWLES & COMPANY. Cross Petitioners and Appellants.

**Fraud in Sale:** RESCISION. A sale of goods to a purchaser, who has a secret intention of not paying for them may be rescinded.

EVIDENCE. A dealer knew that false ratings were given him by commercial agencies, and made false representations himself concerning his solvency, and bought in small lots, on time, from sixty-three wholesalers to an amount greatly in excess of the demands of his trade and his ability to pay. He duplicated goods on hand, and bought unseasonable goods, and urged prompt delivery. *Held,* that these facts prove an intention of cheating the sellers out of the purchase price.

FALSE REPRESENTATIONS. A sale of goods to a vendee, who falsely represents himself either to the vendor or a commercial agency, to be solvent, knowing himself to be insolvent, which sale is made in reliance upon those representations, can be rescinded, although the sale was not made for a year after the representations were made.

TO COMMERCIAL AGENCY. Where a commercial agency gives a dealer a rating which is false, but is not based upon any statement of the dealer, a sale made to him on the strength of that rating can be rescinded, if he referred the vendor to that rating with approval, but not otherwise. ·

SAME. The information gathered by a commercial agency for a particular line of trade is presumed to be for the benefit of those in that line of business, and it is presumed that a vendor in that line rightly uses its reports, and one who makes a statement of his financial condition to an agency does so with the intent that it will be communicated to such of its patrons as may inquire.

EVIDENCE OF SIMILAR FRAUDS. In action to rescind a contract on the ground of fraudulent misrepresentations, it is not necessary to allege conspiracy in order to introdue evidence of similar transactions at or about the same time, each transaction being charged to be one of a series of fraudulent purchases made with secret intent not to pay, and through false representations.

OF INSOLVENCY. Evidence that a dealer has a stock of goods worth fifteen thousand dollars, and at the same time owes twenty-three thousand dollars, and conceals his condition from commercial agencies, fully establishes insolvency.

**Vendor's Lien:** DEFENSES BY MORTGAGEE: *Antecedent debt.* Where a mortgage is given on property to secure debts antedating the purchase of the property, no defense is available to the mortgagee, in replevin by the vendors of such property, which cannot be set up by the mortgagor.

POSSESSION BY MORTGAGEE. Where a vendor is induced to sell goods by fraudulent representations of the vendee concerning his solvency, which goods are thereafter mortgaged for an antecedent

debt, and the vendor elects to rescind the sale, the possession of the goods by the mortgagee will not defeat the claims of the vendor.

**Priority of Liens:** PRACTICE: *Law and equity.* A mortgage given for a consideration, only a part of which constitutes a superior lien as to other creditors, cannot be set aside in a court of law, but a court of equity may order it satisfied to the extent that it is a first lien, and discharged as to the remainder.

REPLEVIN: *Amendment.* Where an action in replevin has been begun in good faith, and facts subsequently discovered indicate that the relief sought is obtainable only in a suit in equity, the plaintiff should be allowed to amend his petition to one in equity.

CONSOLIDATION. Code, section 3644, provides that where two or more actions are pending in the same court, which might have been joined, they may be joined on motion of defendant. *Held,* that the remedy therein provided is not exclusive, and that suits in equity begun in the same court by a number of vendors against a common vendee and a mortgagee of the vendee, to rescind their contracts of sale and set aside the mortgage, may be consolidated on motion of the plaintiff.

*Appeal from Des Moines District Court.*—Hon. James D. Smyth, Judge.

Friday, May 13, 1898.

In 1889, A. A. Adams, with a capital of seven thousand dollars in money and merchandise, which F. O. Adams had paid him for his interest in the estate of A. G. Adams, deceased, begun business at Burlington as a retail dealer in boots and shoes, and continued therein until November 20, 1894. On that day he executed a chattel mortgage covering his entire stock of goods to the National State Bank, securing the payment of an indebtedness of three thousand, seven hundred and fifty dollars, and another to F. O. Adams, trustee, securing thirty-eight notes, bearing different dates, amounting in all to sixteen thousand, three hundred and thirty-three dollars and thirty-eight cents; and under these

mortgages F. O. Adams took possession. On the twenty-
fourth day of November, 1894, the plaintiff filed its peti-
tion in replevin, wherein it alleged certain goods of the
value of four hundred and forty-nine dollars and fifty
cents were purchased from it by A. A. Adams when
insolvent, with the intention not to pay therefor, and
to cheat the plaintiff out of the purchase price; that it
had elected to rescind the sale; and prayed that a writ
be issued restoring the goods. A writ of replevin was
issued accordingly, and the goods described turned over
to the plaintiff. Forty-four suits of the same kind were
begun prior to December 6, 1894, by the defendants and
cross-petitioners, and the goods sold by them to Adams
in whole or in part returned under writs duly issued.
Besides these, three actions in *detinue* were begun. The
petition in each of these cases shows that the goods
were purchased after the debts secured by the mort-
gages were contracted. F. O. Adams, trustee, answered
May 11, 1895, in each action, putting the plaintiffs to
proof, alleging the execution of the mortgages, and that
not all of the indebtedness was incurred prior to the
purchase of the goods. This answer was amended
August 1st, and it was alleged that the bank sur-
rendered certain securities at the time the mortgage
was executed to it, and F. O. Adams, as trustee, in writ-
ing, assumed to pay all unpaid bills of A. A. Adams in
the city to the amount of two hundred and fifty dollars,
as a part of the consideration of the mortgage to him.
The plaintiff thereupon filed "an amendment and sup-
plement to the petition in equity," alleging that up to
the time the answer was filed it had no knowledge of any
new consideration in the mortgages; that the value of
property in possession of F. O. Adams was twenty-seven
thousand dollars, of which A. A. Adams had an unques-
tioned title to that valued at nine thousand dollars; that

goods to the amount of seventeen thousand, seven hundred and twenty-four dollars and thirty-four cents were claimed by forty-five different alleged vendors as having been obtained by fraud, and replevin suits therefor were pending, and also actions in *detinue* by three parties claiming goods valued at one thousand and five dollars and forty-three cents; that Adams had filed the same answer in each of said cases; and the plaintiffs in all said actions were made defendants. It also alleged that adequate relief could not be had in a court of law, and the plaintiff prayed that the mortgages be declared null and void; that its right to the property claimed be adjudged absolute; that if the mortgages or either of them be found a valid lien, in whole or in part, the property to which A. A. Adams' title was not questioned be first applied in satisfaction thereof; and that the rights and priorities of the respective claimants to the property be determined. On the same day a similar amendment and supplement to petition in equity was filed in each of the other cases, and the plaintiff moved that all be consolidated with his action, on the ground of identity of parties, of subject matter, and kinds of action. The defendants filed a motion in each action asking that the amendment and supplement to the petition be stricken from the files because of plain, speedy, and adequate remedy at law; that it occasioned a misjoinder of parties and causes of action; and that the facts stated did not set forth a proper subject of equity jurisdiction. Subject to ruling on the motion, a demurrer on similar grounds was filed in each case. Both the motions to strike and the demurrers were overruled, and the motion to consolidate sustained, and, on motion of the Pontiac Shoe Manufacturing Company, the case was ordered to be tried by the equitable method. This company filed an answer and cross-petition, November 16, 1895, in which substantially the

same allegations are made as in the petition, and containing substantially the same prayer. In addition thereto, however, it is further alleged that "said A. A. Adams caused and permitted a false statement of his financial condition to be published and circulated by the commercial agency of R. G. Dun & Co., whereby he was shown to be solvent, and worth, above his debts, from five to ten thousand dollars, with the intent that the said false statement should be examined and acted upon as true by those who were asked to extend credit to him. Said statement was false, in that he was then insolvent, and his liabilities largely exceeded his assets, as he well knew. Defendant examined said false statement before said order, and, believing the same to be true, was thereby induced to part with his property as stated." All of the plaintiffs in the replevin and detinue suits filed answers and cross-petitions substantially like that of the Pontiac Shoe Manufacturing Company, varying, of course, as to date, description of goods, value and quantity thereof, and as to the commercial agencies consulted and relied on. A. A. Adams answered, admitting the purchase of goods and the execution of the mortgages, but denying all other allegations. F. O. Adams' answer was substantially as heretofore set out. Evidence was introduced, contained in three hundred and sixty pages of the abstracts, and the court entered its decree as prayed by the plaintiff and all the interveners, except C. L. Hathaway & Sons, the American Shoe Company, E. H. Cowles & Co., and Roney & Berger. Against these cross-petitioners judgments were entered in favor of F. O. Adams and E. H. Cowles & Co., and Roney & Berger appeal. F. O. Adams, F. O. Adams, trustee, and A. A. Adams also appeal.—*Reversed* in part.

*Seerley & Clark* and *E. S. Huston* for appellants
F. O. Adams and A. A. Adams; *Blake & Blake* and
*Smyth & Le Wald* for appellants Roney & Berger and
E. H. Cowles & Co.

*Blake & Blake, C. L. Poor, Smyth & Le Wald, W.
W. Dodge, W. H. Stutsman, Stutsman & Stutsman* and
*Kelley & Cooper* for appellees.

Ladd, J.—The plaintiff and the cross-petitioners,
whom we shall term vendors, base their claim to the
goods in controversy on purchases alleged to have been
fraudulently made by A. A. Adams. The mortgages under which F. O. Adams was in possession were executed after, but apparently to
secure debts antedating such purchases. If so, then the
mortgagees, or F. O. Adams, as their agent, could set up
no defense not available to the mortgagor. *Reed v.
Brown,* 89 Iowa, 454; *Starr v. Stevenson* 91 Iowa, 684.
The actions, under such circumstances were maintainable at law. Some six months after these were
begun F. O. Adams, trustee, answered, disclosing
for the first time a new consideration for each
mortgage. The stock invoiced twenty-four thousand,
seven hundred and sixty-eight dollars and ninety-seven
cents. The mortgages amounted to twenty thousand
and eighty-three dollars and thirty-eight cents, and the
vendors claimed ownership of separate portions of the
stock, in all valued at about eighteen thousand dollars.
If these mortgages, or either of them, were found to be
valid liens, that portion of the stock to which A. A.
Adams had an unquestioned title, as well as any of the
goods claimed by vendors and found to belong to him,
should be first applied in satisfaction thereof. The
application could not be required except in a court
of equity. In a sense, then, each vendor was adversely

interested against the other as well as against A. A. and
F. O. Adams, trustee, whom we shall designate as defend-
ants; for, if the proceeds of goods held by the defendants
against certain vendors were applied on the mortgages,
the lien on the goods of those vendors who recovered
would be less or might be extinguished. If the mort-
gages were valid liens for any sum, they operated as a
complete defense in an action at law, even though that
part of the stock to which A. A. Adams had an unques-
tioned title was adequate for their satisfaction. Under
such circumstances, resort to a court of equity was
necessary, that appropriate orders might be entered
for the protection of all parties. Besides, a new consid-
eration of two hundred and fifty dollars for the mort-
gage to F. O. Adams, trustee, was pleaded in the answer.
If this alone were sustained, it would defeat the actions
at law, while in equity the mortgage might be satisfied
to this extent, and defeated in so far as it secured an
antecedent debt. *Zucker v. Karpeles*, 88 Mich. 413 (50
N. W. Rep. 373); *Kitteridge v. Chapman*, 36 Iowa, 348;
*O'Brien v. Harrison*, 59 Iowa, 686; *Wormley v. Worm-
ley*, 8 Wheat, 421; *Dows v. Kidder*, 84 N. Y. 121. The
case at bar differs from *Clark v. Barnes*, 72 Iowa, 563, in
several important particulars. There immediate pos-
session, under an agreement to sell in the usual course
of business, was held to impose a responsibility amount-
ing to a new consideration, which would give priority to
the mortgage over a prior unrecorded bill of sale exe-
cuted as security. There the title was in the mortgagee;
here, if the allegations of the petition are true, he had
no title after the election to rescind the sale. There he
was bound to sell in the usual course of business; here
he was unrestricted. F. O. Adams simply held the
goods in controversy, in connection with others, which
he might properly sell and apply on the mort-
gages. We do not think mere possession should
defeat the claims of the defrauded vendors. See
*Barnard v. Campbell*, 58 N. Y. 76. Virtually, this was

so held in *Reed v. Brown, supra.* The doctrine of *Clark v. Barnes* ought not to be extended, and, in any event, no more than the expenses incurred under the terms of the mortgage, securing an antecedent debt may be set up as against the suit by a defendant vendor. These were neither pleaded nor proven. The plaintiff could not well have anticipated the disclosures of the defendant's answers, and it was not an abuse of discretion to permit it to file the amendment setting forth a cause of action in equity praying for appropriate relief.

II. It is said, however, that a petition in replevin or *detinue* cannot be so amended as to become a petition in equity. The right to do so in other actions, prosecuted by ordinary proceedings, is well settled. *Barnes v. Insurance Co.,* 75 Iowa, 11; *Newman v. Insurance Ass'n,* 76 Iowa, 56. Now, there is nothing sacred about a replevin suit. The pleadings are exceptional only as so made by statute, and in other respects are governed by the same rules as obtain in ordinary actions. It is true possession of property may be acquired, pending litigation, by giving ample security, unless a delivery bond is furnished. This is not for the purpose of affording either party a benefit or advantage, as suggested by the appellants, but to assure the status of the property or its equivalent in value. If, after an action to recover specific property has been begun, it develops that the plaintiff can only obtain relief in chancery, and that the issues are properly triable there, it is not perceived why he ought not to be permitted to amend his petition, and have the action transferred to that side of the calendar. The mere fact that he was misled into bringing an action in the wrong forum ought not to defeat his recovery. Code, section 3432. Under the code system of pleading, no litigant should be denied relief because of an error in the mere form of the action, when ready, by amendment,

to adopt that appropriate to the relief prayed. The mere method should not obscure the results to be obtained. Where a suit in replevin is begun in order to obtain possession of the property, with the purpose of afterwards amending so as to ask equitable relief, such an amendment ought not to be permitted. But where such an action has been brought in good faith, and facts subsequently discovered indicate that the only relief sought must be had in another forum, we think the plaintiff should be permitted to amend his petition accordingly. In such a case though, possession of the property has been acquired, the defendants are amply secured and will not be prejudiced by the change. See Code, section 3641; *Cook v. Railway Co.*, 75 Iowa, 169; *Weaver v. Kintzley*, 58 Iowa, 191; *Homan v. Hellman,* 35 Neb. 414 (53 N. W. Rep. 369); 1 Enc. Pl. & Prac. 569.

III. What has been said disposes of the contention that there was a defect of parties and of causes of action in the original petition, but we understand this same objection to be urged against the consolidation of the actions. Such an objection might be urged with greater force were they on the law side of the calendar. The important inquiry in equity, however, is with respect to the identity of the subject-matter involved. The aim is to bring in all the parties in interest, and suits will be consolidated without especial regard to the identity of parties. This is because of the power of such a court to make appropriate orders, according each party exact justice. *Russell v. Bank*, (Ill. Sup.), 29 N. E. Rep. 37; *Moore's Adm'r v. Francis*, 17 Tex. 28; 4 Enc. Pl. & Prac. 692; *Biron v. Edwards*, 77 Wis. 477 (46 N. W. Rep. 813). In the last case it is said: "We cannot doubt that the power inheres in a court of equity, in its discretion, to consolidate causes pending therein, for the purpose of avoiding a multiplicity of the suits and trials, when the consolidation

can work no injury to any party. This power is essential to the proper administration of justice, and does not depend upon any statute for its existence." Section 3644 of the Code does not apply to such a case as that before us, and we do not think the remedy there provided is exclusive. See *Viele v. Insurance Co.*, 26 Iowa, 9; *Turner v. Bradley*, 85 Iowa, 512. Now, in these actions all the vendors as well as the defendants were interested in (1) the validity of each mortgage and the amount owing thereon; (2) the amount of goods, if any, held to be subject to the payment of the mortgages; (3) in the amount of goods each vendor should recover; (4) and, as will be seen, nearly all the evidence introduced was admissible on the issues raised in each petition as amended. Besides, the parties were identical, except that the plaintiff in one case was the defendant in every other. Under such circumstances, it would have been an inexcusable waste of time to have tried each action separately, and unnecessary cost would have been incurred. We think there was such identity of interest, of subject-matter, and of parties as to warrant a court of equity, in order to avoid a multiplicity of suits, to order their consolidation.

IV. It will be observed that the defendant A. A. Adams is charged by each vendor with purchasing the goods with a secret intention of not paying therefor, and of executing the mortgages as a part of that scheme. If he had such an intent, and failed to disclose it, this would be a fraud on the vendor, owing to which the sale could be rescinded. *Starch Factory v. Lendrum*, 57 Iowa, 581; *Lindauer v. Hay*, 61 Iowa, 665. See *Wilmot v. Lyon*, 49 Ohio, 296 (34 N. E. Rep. 720). It is also alleged by some of the vendors that he falsely represented himself as solvent, knowing he was not, and that goods were sold in reliance thereon. If so, such sales might be rescinded, and the goods

recovered. *Reid v. Cowduroy*, 79 Iowa, 169. If the evidence bearing upon the issues raised on the petition or cross petition entitled the vendors to recover on either of these grounds, then the conclusion of the district court must be sustained. To determine these questions, resort to the very voluminous record is necessary.

V.   It is not necessary to allege conspiracy in order to prove similar transactions. Only enough need be stated to warrant the relief prayed. If the issues presented involve the intention or good faith of the defendants, then, as bearing thereon, evidence is admissible of like transactions at or about the time, or that the act complained of is a part of a series of similar occurrences. If Adams had purchased but one small bill of goods through misrepresentation or concealment, it might well be argued that there was no intent to defraud, because of the small profit. But when it appears that this is only one of a series of different purchases, made under similar circumstances, and a part of a scheme to accumulate goods valued at thousands of dollars, on credit, then his fraudulent purpose is apparent. Bigelow, Fraud, 160; *State v. Brady*, 100 Iowa, 191; *Rowley v. Bigelow*, 12 Pick, 306; *Insurance Co. v. Armstrong*, 117 U. S. 591 (6 Sup. Ct. Rep. 877); *Schofield v. Shiffer*, 156 Pa. St. 65 (27 Atl. Rep. 69).

VI.   The insolvency of A. A. Adams during 1894 is fully established by the evidence. According to his own testimony, he had a stock of fifteen thousand dollars in the spring, and owed the National State Bank two thousand, seven hundred and fifty dollars, and his brother, as trustee, about sixteen thousand dollars. Besides this, the evidence tends to show that he was owing, on bills not due, in the neighborhood of five thousand dollars. By other witnesses the value of the stock at that time was placed at from eight thousand dollars to twelve thousand dollars. Looking

at the record in the most favorable light, it indicates that he did not have property sufficient to satisfy his debts at any time during the year. When F. O. Adams took the invoice in November, 1894, the stock amounted to twenty-four thousand, seven hundred and sixty-eight dollars and ninety-seven cents. At that time A. A. Adams owed at least twenty thousand, one hundred and eighty-six dollars and seventy-two cents for goods purchased, and twenty thousand and eighty-three dollars to the bank and the trustee, making the excess over his liabilities fifteen thousand, five hundred and ten dollars and seventy-five cents. Adams explains this by saying that he did not know he owed his brother so much. All but three of the notes to F. O. Adams, as trustee, were in his handwriting, and, as he kept a set of books, he must have known approximately what was due. From these facts, and his concealment of the amounts due the bank and the trustee from his creditors and the commercial agencies, we are satisfied he was insolvent, and was fully aware of his financial condition.

VII. The evidence shows that A. A. Adams had been credit man in his father's wholesale house for many years, and understood that wholesale dealers based their credit on reports gathered from commercial agencies. That they so did is proven. The representations a business man makes to commercial agencies relating to his business or pecuniary responsibility are expected to be communicated to others and to be acted upon. The very business of a commercial agency is to obtain such information and communicate it to its patrons. Any one making statements to such an agency, relating to his business or responsibility, must know and be held to intend that whatever he represents will be communicated to such of its patrons as may have occasion to inquire. When

these representations are communicated to a patron of the agency, and he relies on them in selling, and they are false, he may rescind the sale. *Stevens v. Ludlum,* 46 Minn. 160 (48 N. W. Rep. 771); *Lindauer v. Hay,* 61 Iowa, 663; *Carvill v. Jacks,* 43 Ark. 454; *Booth v. Wonderly,* 36 N. J. Law, 250; *Eaton v. Avery,* 83 N. Y. 31; *Lennessee County Sav. Bank v. Michigan Barge Co.,* 52 Mich. 164; 8 Am. & Eng. Enc. Law, 643. In 1893, Adams made a statement to Bent, as agent of the American Boot & Shoe Reporting Company, in which he represented his stock to be of the value of sixteen thousand dollars; outstanding two thousand dollars; owing for goods on spring deliveries, not due, six thousand dollars; but gave no account of his indebtedness to his brother as trustee or to the bank. At first he declined to give any information, but finally did so. He knew its purpose, and, by concealing his indebtedness, obtained a credit he could not have otherwise had. Fifteen of the vendors sold goods to him on the faith of this report. It is said, however, that it was made nearly a year before the purchases. But, according to defendant's testimony, his business continued the same, and he allowed the report to continue and remain unchanged, knowing it was being used by the trade as a basis of credit. All of these vendors were entitled to rescind their contract of sale. *Lindauer v. Hay, supra.* To the agent of the American Shoe & Leather Association he represented that he owed no overdue bills for merchandise, and his assets exceeded his liabilities. No mention was made of the indebtedness in controversy. Geo. H. Lewis & Sons sold in reliance on this report, and should have the relief prayed.

VIII. The P. Cox Manufacturing Company requested Adams to make a statement as a basis of credit, and he answered that he owed only three hundred and fifty dollars, not yet due, and that the National

Shoe & Leather Association could not find a cent of indebtedness against him except this. Here, to an inquiry calling for his true financial condition, he responded, deliberately concealing an indebtedness exceeding the value of his stock. He referred E. H. Stearns & Co. to the above letter, and they sold in reliance on the statements it contained. E. P. Reed & Co., relied on the statement to their agent that his stock was worth seventeen thousand dollars, and he did not owe to exceed five thousand dollars. It seems hardly necessary to add that each of the vendors were entitled to rescind the sale owing to Adams' fraudulent concealment of his indebtedness.

IX. It is insisted by the appellants that the defendants made no statement to the agent of R. G. Dun & Co., or Bradstreet Commercial Agencies, and hence any information coming from them was not disseminated by his authority. The evidence, however, conclusively shows that he knew just what these reports were, and referred vendors to them, and also to the agencies. To Wallace, Elliott & Co. he expressly suggested that R. G. Dun & Co. had a resident agent, who was well qualified to give him information. To the agent of Roney & Berger and E. A. Stark & Co. he said the rating of Dun & Co. of ten thousand dollars was correct, and he did not owe five thousand dollars on the stock. To Reynolds & Co. he wrote that he was not advised what mercantile agencies they used as a basis of credit, but Dun & Co. and Bradstreet both had resident agents, and he thought he could satisfy them. To Frank, Herman & Co. he suggested that Dun & Co. and Bradstreet had resident agents in the city, to whom they might wish to refer. To Medlar-Holmes Shoe Company he again made the same suggestion. Thus it appears that he not only knew the information being

disseminated by the agencies, but approved it as correct. The reports of Dun & Co. indicated the value of his assets over liabilities at five thousand dollars to ten thousand dollars, and those of Bradstreet at from three thousand dollars to five thousand dollars, with no intimation of the large indebtedness to the bank or trustee. Those firms which he referred directly to the Dun & Co. and Bradstreet agencies, and who sold in reliance on the information derived therefrom, were deliberately deceived, and may rescind their sales.

X.   Seventeen other firms sold goods in reliance on information obtained in the credit books or special reports of R. G. Dun & Co., or Bradstreet, or both. Adams had made no direct statement to these agencies, and had not referred the firms to them. It is true he knew the information they were giving, and to other concerns approved it as reliable. But, so far as these vendors were concerned, he neither gave the information, nor authorized its use by them, and they cannot base a recovery on the charge that the goods were obtained by false representations through these agencies. See *Dorman v. Weakley*, (Tenn. Ch. App.) 39 S. W. Rep. 890.   Again, the defendant urges that many of the vendors were not subscribers to the agencies relied on.   A careful examination of the evidence shows that all but two were either subscribers or received special reports.   One of these referred to the credit book of Dun & Co., and the other to that of the American Boot & Shoe Reporting Company.   The contract of the latter company is not set out.   Presumably the information gathered by it for that particular line of trade was for those connected therewith, and the vendor rightly used its reports. *Eaton v. Avery, supra*.

XI.   But Adams knew that the reports of Dun & Co. and of Bradstreet were being used as a basis of

Vol. 105 Ia—27

credit, and, while the seventeen vendors had not been authorized by him to rely on their reports, this evidence is material as bearing on the intention he had in purchasing goods. The fact that he made express representations when necessary to aid him in accumulating an immense stock of goods will aid in determining the purpose he had in buying of the more confiding wholesale dealers. As bearing on his purpose, evidence of the entire scheme and the methods resorted to may be considered. Now, he bought the goods in small lots, as in the ordinary course of business, from sixty-three houses, knowing that credits, if extended, would be on the basis of his rating with the commercial agencies. To many of these he directly misrepresented his financial condition, and did so to others through agencies. When making purchases, he knew he was insolvent. He bought and received goods to the value of at least ten thousand dollars for fall deliveries more than ever before. His sales for the year up to November 20, 1894, were but eight thousand and fifty-nine dollars and forty-four cents, and yet he ordered twenty-two thousand dollars' worth of goods. Adams attempts to explain these purchases by saying he expected to open another store, but he had never mentioned the matter to his creditors, had made no arrangements for storeroom, and had merely spoken to Reilley about managing it. Besides, he made purchases of goods similar to large amounts he then had, after he was aware Reilley would not be with him. Again, he purchased goods out of season,—that is, those for fall delivery which could not, in the ordinary course of business, be sold till spring,— and of some lines in unusual quantities. The bills matured between January 1st and April 1st of the following year, and he must have known that it would be utterly impossible to pay but a fraction of them when matured.

He continually urged the necessity of early delivery during September and October. These facts and circumstances lead to but one conclusion, and that is that he was accumulating an immense stock of goods for a retail dealer, with no reasonable expectation of paying therefor. The demand of Stearns & Co for the immediate payment or security of its bills of eight hundred dollars was the excuse, rather than the cause, of executing the mortgages. The evidence amply supports the conclusion of the district court that the purchases were made with the intention of cheating the sellers out of the purchase price.

XII. It should be stated that A. A. Adams denies making the representations heretofore referred to, and says that he did not regard the debts to the bank and his brother, as trustee for his brother and sisters, as affecting his credit. His letters, however, confirm the evidence of the various agents, and his statements concerning the debts, in view of his intelligence and his long business experience, are unworthy of belief. The mortgage to the bank has been paid, and a sufficient amount remains in the hands of F. O. Adams to satisfy his obligation, to discharge the indebtedness of A. A. Adams to the amount of two hundred and fifty dollars, and to pay any costs chargeable in the foreclosure proceedings. To the contention of the appellants, that under the bank mortgage its agent was entitled to costs and nominal damages, it may be said that, even though true, this would not warrant a reversal. The judgments against E. H. Cowles & Co. and Romey & Berger are REVERSED and in all other respects the decree of the district court is AFFIRMED.