**Matter of WOERDERHOFF SHOE CO.,
Inc., Bankrupt.**

**No. 3051.**

United States District Court
N. D. Iowa,
Cedar Rapids Division.

June 20, 1960.

Meyer M. Kahn, St. Louis, Mo., and Bryce M. Fisher and James F. Pickens, Cedar Rapids, Iowa, for petitioner, Endicott Johnson Corporation.

Thomas M. Collins, Cedar Rapids, Iowa, for M. W. O'Rieley, trustee.

GRAVEN, District Judge.

This matter is before the Court on a petition to review the Referee's denial of a creditor's petition to reclaim certain shoes which the creditor claims to have sold and delivered to the bankrupt on credit as the result of fraudulent representations by the bankrupt's president concerning its financial condition.

The bankrupt Woerderhoff Shoe Co., Inc., a corporation organized and existing under the laws of the State of Iowa, operated two retail shoe stores in Cedar Rapids, Iowa. For convenience, one store will be referred to as Store No. 1 and the other as Store No. 2. The creditor here involved, Endicott Johnson Corporation, is a corporation organized and existing under the laws of the State of New York with a branch office in St. Louis, Missouri. The bankrupt purchased merchandise from the Endicott Johnson Corporation for approximately three years under a so-called budget plan. On the basis of financial statements submitted to it by the bankrupt near the beginning of each year, the petitioner would extend to the bankrupt a certain amount of credit for the remainder of that year or until it received new financial statements during the first part of the following year. The amount of credit here involved was approximately $8,500. Of that amount, $4,750 was allocated to Store No. 1 and the balance was allocated to Store No. 2. Although there were two stores, there was only one debtor: the bankrupt corporation. The bankrupt would give to the petitioner a series of checks which were blank except for signature. As merchandise was ordered by and shipped to the bankrupt, the petitioner would fill in a check as to the amount, date, etc., and present it for payment. The amount for which the check would be drawn by the petitioner was based upon an advance estimate of the bankrupt's receipts for the week in which the check was written. If the check were paid, the bankrupt's account would be credited accordingly. For example, if the bankrupt ordered and received $2,000 worth of goods on credit, the amount of credit remaining available to it would be reduced to $6,500. If $1,500 were then paid on the account, the amount of credit available to the bankrupt would be $8,000. Sometimes the bankrupt's checks would be returned to the petitioner unpaid because of insufficient funds. In that event the petitioner would resubmit the check through collection channels until it was paid. Neither party attributed any particular significance to the fact that a check was returned unpaid; it merely represented a

miscalculation of the bankrupt's anticipated receipts.

The petitioner claims it extended credit to the bankrupt until June of 1958 on the basis of a profit and loss statement covering the period from February 1, 1956, to January 31, 1957, and a balance sheet which showed the condition of the business on January 31, 1956, and January 31, 1957, which were submitted by the bankrupt's president, Mr. Woerderhoff.

In March of 1958 the petitioner's divisional credit manager, while visiting other accounts in the Cedar Rapids area, called upon Mr. Woerderhoff and inquired whether later figures showing the company's financial condition were available. He was told by Mr. Woerderhoff that new financial statements would be submitted and that things were in "pretty good shape." In May of 1958 the petitioner received a profit and loss statement showing the condition of the bankrupt's business for the period from February 1, 1957, through January 31, 1958, and in June of 1958 it received a balance sheet covering the period from January 31, 1957, through January 31, 1958. Thereafter, according to the petitioner, it relied upon the new financial statements in extending credit to the bankrupt.

The bankrupt had been in financial difficulty since 1953, at which time it had a staggering debt load. Mr. Woerderhoff placed a substantial amount of his personal funds into the enterprise and continued to operate it with the hope and expectation that out of the profits he could improve its financial condition. Beginning in the spring of 1958, the bankrupt experienced increased difficulty in satisfying its creditors. In June of 1958, the limits of the credit allocated to Store No. 1 having been reached, the petitioner's credit manager told Mr. Woerderhoff that credit would be extended beyond the limits theretofore set if Mr. Woerderhoff wished to personally guarantee payment of the additional merchandise. Mr. Woerderhoff declined to so do. Between June and September of 1958 the petitioner did not fill orders from Store No. 1 because that store's credit limits had been reached and several of its checks had been returned unpaid. During that period Store No. 2 continued to receive shipments of shoes because it was making payments on its account. In September, 1958, Mr. Woerderhoff telephoned the petitioner's credit manager and asked why an order for approximately $2,000 worth of goods had not been shipped to Store No. 1 and was told that that account had reached its limits and that the shoes would not be shipped until the amount due on the account was reduced. Mr. Woerderhoff then agreed to and did send to the petitioner six checks, in the amount of $350 each, to replace those which had previously been returned because of insufficient funds. The new checks were not in payment of the $2,000 order but were to pay for merchandise theretofore received by the bankrupt so that new goods could be shipped without exceeding the credit limits. Subsequent to the conversation between Mr. Woerderhoff and the credit manager, the petitioner shipped approximately $2,100 worth of shoes to the bankrupt. Some of the new checks were paid and some were not. In the meantime, however, the bankrupt had been unable to obtain the necessary quantity of merchandise and sales consequently diminished to the point where it ultimately became impossible for it to continue.

On November 14, 1958, the petitioner rescinded the sale of the shoes to the bankrupt and notified the bankrupt's president thereof as well as of the fact that it intended to reclaim the shoes sold to the bankrupt and then in its possession. The bankrupt, on the same day, surrendered to the petitioner certain shoes which were then in its possession. On November 17, 1958, the Woerderhoff Shoe Co., Inc., filed a voluntary petition in bankruptcy. On the following day it was adjudicated bankrupt and a receiver was appointed to take charge of its property. On November 24, 1958, the Endicott Johnson Corporation filed its

reclamation petition herein. The petition alleges, *inter alia*, that between February 21 and October 28, 1958, the petitioner sold and delivered to the bankrupt, on credit, certain shoes of the value of $8,657.84; that a balance of $8,625.36 is due and owing to the petitioner by the bankrupt; that the above-described financial statements submitted to it by the bankrupt's president constituted fraudulent representations as to the bankrupt's financial condition in that its net worth was fraudulently overstated; that at the time of making and issuing each of the said financial statements the bankrupt's president knew of the falsity thereof and delivered them to the petitioner for the purpose of inducing it to sell and deliver merchandise to the bankrupt on credit; and that as a result of the fraudulent representations the petitioner was induced to sell and deliver the shoes to the bankrupt and to extend credit in connection therewith. The parties stipulated that the financial statements were materially incorrect in that the accounts payable were substantially and materially understated. It was further stipulated that the merchandise surrendered to the petitioner is the merchandise shipped by it to the bankrupt and for which it has not received payment and that such merchandise might be sold and the rights, if any, of the petitioner may attach to the proceeds of the sale to the same extent as its rights to the merchandise itself. The goods have been sold, and the proceeds of the sale are being held pending a determination of the petitioner's rights thereto.

As heretofore noted the Referee, after hearing the evidence, denied the reclamation petition. The Referee found that the petitioner failed to establish that Mr. Woerderhoff did not intend to pay for the shoes and that the petitioner did not rely upon the false financial statements. Those findings of the Referee are the subject matter of this review.

■ The Referee's findings of fact must stand unless they are clearly erroneous. See Dunsdon v. Federal Land Bank of St. Paul, 8 Cir., 1943, 137 F.2d 84; Rait v. Federal Land Bank of St. Paul, 8 Cir., 1943, 135 F.2d 447; Equitable Life Assur. Soc. of United States v. Carmody, 8 Cir., 1942, 131 F.2d 318. In the preceding thirteen years in which this Court has reviewed the decisions of the present Referee, no findings of fact by him have been held to have been clearly erroneous.

■ The Referee's findings of fact are not clearly erroneous if they are supported by substantial evidence. Boyce v. Chemical Plastics, 8 Cir., 1949, 175 F.2d 839, 841; Link v. Boeshans, 8 Cir., 1945, 151 F.2d 322, 324; Equitable Life Assur. Soc. of United States v. Deutschle, 8 Cir., 1942, 132 F.2d 525, 526. They are clearly erroneous if they are based upon a substantial error in the proceeding or upon a misapplication of the controlling law, or if they are unsupported by any substantial evidence or are contrary to the clear weight of all the evidence. Kauk v. Anderson, 8 Cir., 1943, 137 F.2d 331, 333.

■ Whether or not the petitioner is entitled to rescind the sale and to recover the proceeds thereof is a question to be determined under the Iowa law. 4 Collier on Bankruptcy, par. 70.41 (14th Ed. 1942). It was and is the contention of the Trustee that notwithstanding a vendee's furnishing of false financial statements to a vendor for the purpose of purchasing goods on credit, such vendor may not rescind the sale and recover back the goods absent an intent on the part of the vendee not to pay for them. The cases principally relied on by the Trustee in support of that contention are Gillespie v. J. C. Piles & Co., 8 Cir., 1910, 178 F. 886, 44 L.R.A.,N.S., 1; Mulroney Mfg. Co. v. Weeks, 1919, 185 Iowa 714, 171 N.W. 36; and Houghtaling & Co. v. Hills, 1882, 59 Iowa 287, 13 N.W. 305. Those cases will next be considered.

In the Gillespie case, supra, one Hough was in the business of buying and selling hogs in Des Moines, Iowa. Upon his being adjudged bankrupt, a receiver took possession of and sold certain hogs which

had been shipped to Hough by vendors. The vendors intervened in the bankruptcy proceeding and claimed the proceeds of the sale on the ground that the sales of the hogs to Hough were induced by his false representations concerning his financial condition, by his fraudulent concealment of insolvency, and because he intended not to pay for the hogs when he bought them. The Referee found that none of the sales was induced by fraudulent representations or concealment, that Hough was insolvent when he purchased the hogs but that there was no intent on his part not to pay for them, and denied the vendors' prayers. The District Court reversed the Referee and ordered the Trustee to pay the proceeds of the sale of the hogs to the vendors. The Trustee appealed on the ground that the evidence did not sustain the finding of fraudulent representation or concealment or an intent not to pay for the hogs. The Court of Appeals for this Circuit stated (178 F. at page 888):

> "A vendor, who sells personal property to an insolvent vendee, who at the time he buys does not intend to pay for it, may rescind the sale and recover the property or its proceeds from any one but an innocent purchaser, and neither a receiver nor a trustee in bankruptcy is such a purchaser. A decisive question in the case therefore is: Did Hough intend not to pay for these hogs when he bought them?
> *   *   *  "

Continuing, the Court stated (pp. 890–891):

> "It is contended, and it is conceded, that the insolvency of a purchaser does not prove his intent not to pay for the goods which he buys. Many an insolvent obtains goods on credit with the honest intent to pay for them, and many times he succeeds in doing so. It is probable that Hough in this case bought and paid for hogs whose purchase price was more than $1,200,000 while he was insolvent, and he undoubtedly intended to pay for them when he bought them by buying and selling the hogs of other vendors and appropriating their proceeds to make the payments, in the hope that the market would change and the losses he was constantly sustaining would change to profits. As long as vendors would sell to him and the bank would honor his drafts, such an intent was possible, and if, when the hogs of these interveners were shipped and were accepted, it had been possible for Hough to have continued to carry out his scheme, to have purchased of other vendors, to have drawn the proceeds of the sales of their hogs to the bank, and to have used them to pay earlier vendors, or even if he could have had a reasonable expectation that he could have continued to do these things, the finding of the referee that he had no intent not to pay for these hogs might have been sustained.

> "But he was not in the same financial or mental condition when he purchased of the interveners that he had occupied when he bought of earlier vendors. When he made the earlier purchases he had a reasonable expectation that he could pay for the hogs he purchased with the proceeds of hogs of later vendors in the way in which he had paid for other purchases for months. But when he bought of the interveners he knew that he had no money or credit with which to pay for their hogs, that the only way in which he could pay for them was by the purchase and the sale of the hogs of subsequent vendors and the appropriation of the proceeds of these later purchases through the bank to the payment of the interveners, and he knew that he could not pay for them in that way because subsequent vendors would not sell to him after his known failure, and the bank would not take his drafts or honor his checks. In this state of the case it is incredible that he in-

tended to pay for these hogs when he bought them. He knew it was impossible for him to pay for them, and the human mind is so constituted that it cannot harbor a serious intent that the being it directs shall do that which it knows it is impossible for it to accomplish. An insolvent buyer, who knows at the time of his purchase that his financial condition is such that it is and will be impossible for him to pay for his purchases, is conclusively presumed to have bought them with an intention not to pay for them; and a persuasive legal presumption to that effect arises from the fact that such a purchaser's affairs were in such a condition at the time of the purchase of the property that he could then have had no reasonable expectation of paying for it. * * There was no error in the finding of the court that Hough bought the hogs of the interveners with the intention not to pay for them, nor in its order that the trustee pay over to them the proceeds of the hogs less the expense of their feeding and yardage."

The Court of Appeals in its opinion in the Gillespie case, therefore, recognizes that a vendor may rescind a sale and recover the property or its proceeds if the vendee at the time of the sale does not intend to pay and holds that an intention not to pay may be shown by the fact that the vendee at the time of the purchase knew that his financial condition was such that it would be impossible for him to pay for the property. However, it is the view of this Court that the Court of Appeals did not hold or intimate that no sale may be rescinded unless the buyer intended not to pay for the property at the time of the sale. In other words, while a vendor may rescind a sale if the vendee intended not to pay for the purchase, that is not the only ground upon which a rescission may be had.

In Mulroney Mfg. Co. v. Weeks, supra, the buyer and seller had dealt with each other for two or three years. In July, 1916, the buyer ordered goods of the value of $802.70. At that time he was already indebted to the seller in an amount exceeding $600. The seller refused to ship the order until the buyer made a substantial payment on the existing indebtedness. In September, 1916, the buyer, desiring to obtain the goods ordered in July, gave the seller a check for $223.47 to apply on the account. The seller, relying upon the check, delivered the July order. There were no funds in the bank upon which the check was drawn, and the buyer absconded. A petition in bankruptcy was later filed, and the seller rescinded the sale and brought an action to replevy the goods on the ground that they had been obtained by the buyer's false and fraudulent representations. From a jury verdict and judgment in favor of the seller the Trustee in Bankruptcy appealed. In affirming the judgment, the Court held that where a buyer obtains possession of goods by delivering to the seller a false check knowing it to be false and knowing himself to be insolvent, and the seller receives the check believing it to be good, the seller may rescind the sale and recover the goods from the buyer's Trustee in Bankruptcy. The delivery of a check is a representation that it is good and will be paid upon presentation.

The case of Houghtaling & Co. v. Hills, supra, involved an effort by vendors to replevy certain packages of tea. In their petition the vendors alleged that the vendee, at the time of the pretended purchase, knew that he was hopelessly insolvent and unable to pay for goods for which he already owed; that he knew the vendors were ignorant of his insolvency; and that if the vendors had known of the vendee's insolvency they would not have sold him the tea. The vendee's demurrer to the petition was sustained. On appeal the trial court was affirmed because the petition did not allege that the vendee purchased the goods with the specific intent not to pay for them. The Court stated that it is the making of a purchase while insolvent

and with the intent not to pay for the goods purchased which avoids the sale and enables the seller to replevy the goods.

It is the view of the Court that the three cases just considered do not lend support to the contention of the Trustee and that it is necessary to consider certain other Iowa cases which bear on the question.

■■ In Reid v. Cowduroy, 1890, 79 Iowa 169, 44 N.W. 351, some vendors attempted to recover certain goods on the ground that they were obtained by the vendee's false and fraudulent representations. The Court instructed the jury that

" 'Where the buyer of goods, at the time of or before the purchase, for the purpose of inducing the seller to part with his goods on credit, makes a material representation to the seller as to his financial condition, which representation is in fact false, and known by the buyer to be false when made, and which the seller relies upon in making the sale, *and it is also shown* that the buyer at the time intended by the representations to defraud the seller, by not paying for the goods, such transaction would be fraudulent on the part of the buyer, and the seller could rescind the contract, and recover back the goods.' " (p. 171, 79 Iowa, p. 351, 44 N.W. Emphasis supplied.)

From an adverse verdict and judgment the vendors appealed, contending that the instruction was erroneous in that in order to recover they were required to show not only that the buyer made false and fraudulent representations as to his solvency upon which they relied but also that he did not intend to pay for the goods when he ordered them. The buyer claimed that the instruction was supported by Houghtaling & Co. v. Hills, supra. With reference to that case the Court stated (p. 172, 79 Iowa, p. 351, 44 N.W.):

"In that case the petition alleged that the buyer was hopelessly insolvent when he purchased the goods, and unable to pay for them; that he knew that fact; that he knew the sellers did not know it, and that they would not have made the sale, had they been aware of it. But it was not alleged that the sellers were misled or deceived by any act or representation of the buyer. The question really involved in the case was whether the *failure of the buyer to disclose* his real financial condition was a fraud upon the seller; and the effect of the opinion is to hold that it was not, and that, inasmuch as the petition did not show that the goods were purchased with the specific intent not to pay for them, it did not state a cause of action. *It did not decide that false and fraudulent representations as to solvency made on the part of the buyer, and relied upon by the seller, would not be sufficient ground to authorize the rescinding of the sale.* Mere silence, where the person is under no obligation to speak, is not a legal fraud. * * * (Emphasis added.)

Continuing, the Court stated (pp. 172–173, 79 Iowa, p. 352, 44 N.W.):

"But where goods are sold there is a promise expressed or implied on the part of the buyer to pay for them; and the seller has a right to rely upon the presumption that the buyer intends to perform his obligations by making payment. Therefore, if the latter entertains a secret intent to not make payment, that intent, and his failure to disclose it, constitute such a fraud as will enable the seller to rescind the sale. * * * The supposed solvency of the purchaser is usually a material inducement to the sale of goods; and where it is, and the purchaser makes false and fraudulent representations in regard to it, upon which the vendor, not knowing

the truth, relies, in effecting the sale, it may be rescinded by the vendor as fraudulent. The charge of the court under consideration was erroneous in requiring plaintiffs to prove two material facts, when proof of one was sufficient to enable them to recover. * * *"

The Reid case, supra, is therefore authority for the proposition that a vendor of goods may rescind the sale and recover back the goods if (1) the vendee makes a fraudulent representation concerning his financial condition upon which the vendor relies, or if (2) the vendee at the time of the purchase intended not to pay for the goods. Accord, P. Cox Shoe Co. v. Adams, 1898, 105 Iowa 402, 75 N.W. 316; see Starr v. Stevenson, 1894, 91 Iowa 684, 690–691, 60 N.W. 217, 219. A vendor may rescind the sale and recover the goods or their value if the sale was induced by the vendee's false representations concerning his financial condition. See Jandt v. Potthast, 1897, 102 Iowa 223, 71 N.W. 216; Endicott Johnson Corp. v. Shapiro, 1925, 200 Iowa 843, 844, 205 N.W. 511, 512. The same is true if the vendee conceals a fraudulent intent not to pay for the goods. Deere v. Morgan, 1901, 114 Iowa 287, 86 N.W. 271; Phelps, Dodge & Palmer Co. v. Samson, 1901, 113 Iowa 145, 84 N.W. 1051; Lindauer v. Hay, 1883, 61 Iowa 663, 17 N.W. 98; Oswego Starch Factory v. Lendrum, 1881, 57 Iowa 573, 10 N.W. 900, 42 Am.Rep. 53. See Seeley v. Seeley-Howe-Le Van Co., 1905, 130 Iowa 626, 105 N.W. 380, 114 Am.St.Rep. 452; Kearney Milling & Elevator Co. v. Union Pac. Ry. Co., 1896, 97 Iowa 719, 66 N.W. 1059, 59 Am.St.Rep. 434. There are two other Iowa cases that should be considered. The first one is the case of Morris v. Posner, 1900, 111 Iowa 335, 82 N.W. 755. In that case some vendors sought to recover the possession of goods on the ground that they were obtained by false representations concerning the buyer's financial condition. It was conceded that at the time the financial statement was made to the vendors the purchaser owed a much larger sum than was stated therein. It was further conceded that the purchaser's husband, who managed the business, expected to be able to continue the business indefinitely and, had he not died, probably would have been able to continue the business for some years. The record showed that the goods would not have been sent to the purchaser but for the financial statement made by her husband, as her agent, in response to the vendors' request. The controlling question, declared the Court (p. 337, 111 Iowa, p. 756, 82 N.W.), was whether the false statement as to the financial condition of the purchaser, unaccompanied by an intent to defraud, was sufficient to entitle the vendors to rescind the sale and to recover back their goods. In holding that it was, the Court stated (pp. 338–39, 111 Iowa, p. 756, 82 N.W.):

"When the plaintiffs were insisting upon detailed information as to the assets and liabilities of Mrs. Posner, her manager knew beyond question the purpose of such request. He knew that it was information which was to determine whether credit should or should not be extended to her. He knew that the object of the plaintiff's inquiry was to ascertain the financial condition of Mrs. Posner, and her ability to pay her debts. No other conclusion could be drawn from the persistent repetition of the request. He knew that the statements sent to the plaintiffs did not show her actual indebtedness within five or six thousand dollars, and the conclusion is irresistible that the false statement made as to her liabilities was made for the purpose of obtaining credit from these plaintiffs. The law itself presumes that he intended his statement to be relied upon, and it was relied upon, and Mrs. Posner was notified by letter before the goods were shipped that the order would be filled on the strength thereof. What additional element is necessary to authorize a rescission

of this sale on the ground of fraud? The defendants contend that, because an intent to cheat is not proven, no rescission of the sale can be made. It has been held by this court that 'where the supposed solvency of the debtor is a material inducement to the sale of goods, and the purchaser makes false and fraudulent representations in regard to it, * * * which are relied upon, the sale may be rescinded.' Reid v. Cowduroy, 79 Iowa, 169, 44 N.W. 351, 18 Am.St.Rep. 359. It may be questioned in this case whether Mrs. Posner was at the time insolvent. She had not declared herself so, nor had it been judicially determined that she was; but this, we think, is not controlling. Her business may have been on the verge of collapse for some time, and still she may have deemed herself solvent; while from the same state of facts the plaintiffs may have considered her practically insolvent. When asked to extend credit to her, they were entitled to know her exact financial condition for the purpose of determining for themselves this very question. Her information to them was intentionally false, and by reason thereof they were induced to part with their property. Her act was, therefore, fraudulent, and the plaintiffs, upon discovery of the fraud, could rescind the sale. * *"

As in the Morris case, supra, in the present case it is not clear whether the bankrupt was solvent or insolvent at the time it ordered the goods or submitted the financial statements relied upon. Whether the bankrupt was solvent or insolvent at such time is, however, immaterial. In Starr v. Stevenson, 1894, 91 Iowa 684, 60 N.W. 217, the Court declared (p. 691, 91 Iowa, p. 219, 60 N.W.) that instructions which require the vendors to prove, in addition to false and fraudulent representations made by the vendee, his insolvency and concealment thereof, are erroneous. The Court continued (p. 691, 91 Iowa, p. 219, 60 N.W.):

"The fact of the insolvency of the buyer is not controlling, whether the contract is sought to be rescinded because of fraudulent representations, or because of an intent never to pay for the goods. It is an evidentiary fact, bearing more or less remotely upon the main question. An insolvent may buy goods, fully intending to pay for them, although the fact of his insolvency would tend strongly to show he did not intend to pay. Again, a sale made to a person who is perfectly solvent and responsible may be avoided because of fraudulent representations inducing the contract. * * *"

The finding of the Referee that the petitioner failed to establish that the bankrupt did not intend to pay for the shoes at the time in question is a finding of fact. This Court is of the view that it cannot be said that such finding is clearly erroneous. However, the Iowa cases discussed make it clear that where a vendor is induced by false representations to sell goods on credit, the fact that the purchaser may have intended to pay for the goods does not in itself prevent the vendor from rescinding the sale and recovering back the goods. In other words, such a sale is not rendered rescission-proof by the fact that the vendee may have intended to pay for the goods. However, in order for the petitioner to rescind and recover back the goods, it must have established that the bankrupt did submit false financial statements and that the bankrupt knew of such falsity. It further must have established reliance on such statements.

It was heretofore noted that the parties stipulated that the financial statements submitted by the bankrupt to the petitioner were materially incorrect in that the accounts payable were substantially and materially understated. That is, the figures set forth in those statements as to the bankrupt's accounts payable were false. Those figures did not purport to be estimates. In the balance

sheet of January 31, 1958, the amount of the accounts payable is stated to be the exact sum of $21,476.10, which sum was substantially and materially less than that actually owed. The conclusion seems inescapable that the bankrupt knowingly submitted to the petitioner false and misleading figures as to its obligations.

The bankrupt was in a perilous financial condition. It was finding it difficult, if not impossible, to secure a sufficient supply of shoes to keep its stores in operation. It was the hope and expectation of its president that if the bankrupt could secure an additional supply of shoes from the petitioner it could not only stay in business but could also pay the petitioner for the additional shoes. Thereupon, in behalf of the bankrupt, he submitted financial statements to the petitioner which contained false statements as to the accounts payable of the bankrupt and which he knew were false. The defense of nonreliance upon those false statements is asserted. Where a party makes false representations to another and the defense of nonreliance is asserted, there inheres in that defense the theory that the party to whom the false representations were made was not deceived. The conclusion seems inescapable that Mr. Woerderhoff did falsify the figures as to the bankrupt's obligations with the intent that the petitioner rely thereon. The next question is whether it did rely thereon. In other words, was the petitioner in fact deceived by the deceitful figures? If the petitioner did not rely upon the false representations made by the bankrupt's president, it cannot succeed in this action. See John Blaul & Sons v. Wandel, 1908, 137 Iowa, 301, 114 N.W. 899; Jandt v. Potthast, 1897, 102 Iowa 223, 71 N.W. 216. Whether the petitioner did rely upon the false financial statements is, of course, a question of fact. The Referee found that the petitioner did not rely upon the financial statements in extending credit to the bankrupt. That finding must stand unless clearly erroneous. In his ruling and order the Referee also declared: "The Referee is of the opinion that the petitioner did not *entirely* rely upon the financial statements it had in its possession in shipping the merchandise to the bankrupt, which is the subject of this litigation. * * *" (Emphasis added.) It is the view of this Court that under the Iowa law it is not necessary that false representations be the sole inducement to enter into a contract. If they were relied upon to some extent and but for them the contract or deal would not have been made, it is sufficient. Rorem v. Pederson, 1925, 199 Iowa 304, 201 N.W. 784. Accord, Peterson v. McManus, 1919, 187 Iowa 522, 172 N.W. 460; Skeels v. Porter, 1914, 165 Iowa 255, 145 N.W. 332; Kelty v. McPeake, 1909, 143 Iowa 567, 121 N.W. 529; Dashiel v. Harshman, 1901, 113 Iowa 283, 85 N.W. 85. The Referee seems to have been influenced in connection with the making of his finding of no reliance by certain items of evidence. Those were (1) the petitioner attempted to obtain a guarantee from Mr. Woerderhoff, (2) a statement made by one of the petitioner's salesmen, and (3) the fact that the petitioner received checks from the bankrupt before releasing the $2,000 order. The only evidence in the record concerning the guarantee is that the petitioner's credit manager, sometime after June 3, 1958, discussed the possibility of a guarantee with Mr. Woerderhoff. At that time Endicott Johnson Corporation had extended as much credit as it felt it could on the basis of the financial statements. Mr. Woerderhoff wanted additional merchandise. The petitioner's credit manager told Mr. Woerderhoff that if he wished to personally guarantee payment of additional purchases the petitioner would go beyond the credit limits to the amount of the guarantee. Mr. Woerderhoff declined to so do.

At the hearing before the Referee evidence was admitted, over the objection that it was hearsay, that one of the petitioner's salesmen told a third

person in Cedar Rapids in June, 1958, that he was surprised that the petitioner had approved credit for the bankrupt. In order for the declarations of an agent to be admissible against his principal, they must have been made while he was engaged in the performance of his agency and must have related to the subject matter thereof. Friedman v. Forest City, 1948, 239 Iowa 112, 126, 30 N.W.2d 752, 759. Since there was no showing that the salesman in question had any responsibility in regard to the granting of credit, there was lacking a proper foundation for the admission of such evidence.

It appears that in September, 1958, an arrangement was made whereby the petitioner agreed to ship the bankrupt $2,000 worth of shoes if he furnished checks for that amount. This did not constitute a new arrangement different from the regular budget plan and did not amount to the placing of the bankrupt on a cash basis. There was merely an exchange of checks; new checks were substituted for other checks which had been dishonored. The new checks were in payment of old obligations so the petitioner could ship additional merchandise without exceeding the limits of the bankrupt's account. Mr. Woerderhoff testified that he telephoned the petitioner and other firms to solicit the shipment of merchandise and that they agreed to do so provided he would make payments on the accounts so as to remain within their limits. He further testified that he "never gave a thought" to whether the substitute checks which he gave to the petitioner were to be applied to the whole account.

In connection with the matter of reliance, the Referee made the following statement:

"*Long after* the financial statement or statements had been sent to the petitioner it had its credit representatives call on A. L. Woerderhoff at Cedar Rapids and discuss the situation with him. This resulted in a plan being worked out whereby the bankrupt was to receive credit from the petitioner in a certain amount and was to make scheduled payments on his account. This Referee is persuaded by the record in this respect that the petitioner actually did not rely upon the financial statements in extending the credit to the bankrupt. * * *" (Emphasis added.)

That statement contains an inadvertent misstatement of the record. The undisputed testimony on this point is that the petitioner's credit representative called upon Mr. Woerderhoff in Cedar Rapids in March, 1958, and requested new financial information, which information was received by the petitioner in May and June, 1958.

In connection with the claim of the Trustee as to nonreliance by the petitioner on the financial statements, he called the attention of the Referee to the interval of time which elapsed between the dates of the financial statements and the time when credit allegedly was extended in reliance thereon. The Referee referred to this claim of the Trustee but made no specific statement in regard thereto. The evidence seems clearly to indicate that it was the practice of the petitioner to extend credit to the bankrupt on the basis of financial statements submitted to it near the beginning of each year, for the remainder of that year or until new financial statements were received by it in the succeeding year. In connection with the matter of a lapse of time between the date of a financial statement and the extension of credit in reliance thereon, see Hills Sav. Bank v. Cress, 1928, 205 Iowa 306, 218 N.W. 74; P. Cox Shoe Mfg. Co. v. Adams, 1898, 105 Iowa 402, 75 N.W. 316; Lindauer v. Hay, 1883, 61 Iowa 663, 17 N.W. 98.

It is the ruling and holding of the Court that the finding of the Referee as to nonreliance is clearly erroneous.

It is further the holding of the Court that the petitioner is entitled to reclamation.

It is hereby ordered that the reclamation petition be and the same is hereby granted and the order of the Referee denying reclamation be and the same is hereby reversed.