JENNIE DIMOND, Appellee; v. PEACE RIVER LAND AND DEVELOPMENT COMPANY et al., Appellants.

FRAUD: Acts Constituting Fraud—Asserting Truth of that of Which
1  One has no Knowledge. One who, without knowing whether it is true or false, represents, with intent that it be relied upon, that a material fact is true, to his personal knowledge, which in truth is false, stands on identically the same basis as though he *personally* knew it to be false.

FRAUD: Evidence—Interwoven Statements of Fact and Opinion.
2  Interwoven statements of material *fact* and personal *opinion*, alleged to have induced a sale, may *all* be considered on the issue whether the one defrauded actually relied on the statements of material fact.

APPEAL AND ERROR: Who May Allege Error—Invited Error.
3  Principle recognized that one may not invite error and then advantage himself thereof—may not build error on an instruction given, when he requested substantially the same instruction.

APPEAL AND ERROR: Reservation of Grounds—Instructions—
4  Failure to Object at Trial. Objections to instructions, made for the first time in a motion for a new trial, without any evidentiary showing that such objections were not discovered at the time of the trial, will be disregarded on appeal. (Sec. 3705-a, Code Supp., 1913.)

APPEAL AND ERROR: Who May Allege Error—Error Against
5  Non-Complaining Party. One may not complain of an error advantageous to himself and prejudicial to the non-complaining party. So held where the court *erroneously* told the jury that plaintiff, seeking rescission of a fraud-induced sale, could prevail only in case the land was shown to be of *less* value than as represented.

VENDOR AND PURCHASER: Rescission—Value of Land as Affecting Rescission. A purchaser may rescind a fraud-induced

purchase of land, by reason of misrepresentation as to quality, etc., even though the land is worth the price paid.

**EVIDENCE:** Relevancy, Competency, and Materiality—Subsequent Condition of Thing. Evidence of the condition of a thing long *subsequent* to the time in issue is competent, when such condition pertains to conditions *permanent* and *unchangeable*. So held as to the topography of land and the quality of the soil.

**TRIAL:** Reception of Evidence—Non-Competent Opinions—Waiver. An answer in the nature of a non-competent opinion or conclusion, given to a proper question, which called only for the observations of the witness, must be met by motion to strike.

**WITNESSES:** Cross-Examination—Allowable Scope—Values. One who has testified to long familiarity with the land in question and the value thereof, may be properly cross-examined as to values at prior times, and the extent of his dealings in said lands, and the prices paid therefor.

**APPEAL AND ERROR:** Review, Scope of—Law of Case. Instructions to which no exceptions have been entered constitute the law of the case, and will not be reviewed on appeal.

**TRIAL:** Instructions—Non-Applicability to Evidence. Instructions embracing elements of fact which have no support in the evidence are properly refused.

**TRIAL:** Instructions—Requested Instructions—Non-Contested Facts. Instructions which call upon the jury to determine facts which are non-contested are properly refused.

*Appeal from Boone District Court.*—E. M. McCALL, Judge.

### JANUARY 10, 1918.

ACTION to recover the purchase price of certain land sold by the defendants to the plaintiff, on the ground that the purchase was induced by fraud. Verdict and judgment for the plaintiff. Defendants appeal.—*Affirmed.*

*Dyer, Jordan & Dyer,* for appellants.

*John A. Hull* and *F. W. Ganoe,* for appellee.

GAYNOR, J.—This action is brought to recover from

defendants the amount of money paid on a written contract for the purchase of lands. Plaintiff claims to have rescinded on the ground of fraud.

It appears that the defendant the Peace River Land & Development Company is a corporation organized in this state, and authorized to sell land in Florida; that the defendant E. O. Montgomery is its president; that, on the 27th day of February, 1911, the plaintiff, through her husband, made application to the land company in substantially the following language:

"I hereby contract to take a farm of forty acres of land in De Soto County, Florida, for which I agree to pay $25 per acre, at the rate of $40 a month until paid for. Enclosed within $40 as first payment on farm. I agree to make monthly payments of $40, hereafter on the land until paid for. Upon receipt of this please send me your legal acknowledgment and advise me which tract has been allotted me."

In response to which, defendants issued to plaintiff a bond for warranty deed, so far as material as follows:

"The Peace River Land & Development Company has this day allotted to the purchaser, Jennie Dimond, certain lands, (describing them) containing forty acres."

In said instrument, defendant acknowledged the payment of $40 on said land, and bound itself to deliver a warranty deed when the additional $960 was paid, payment to be made at the rate of $40 on the 27th day of each and every month thereafter.

The bond for deed contained the following stipulation:

"It is mutually agreed that the purchasers who buy without seeing the property shall be allowed 90 days from the date of this contract in which to make a personal investigation of his property; and if the purchaser upon such investigation does not find the property as represented in our literature, he or she may then give notice in writing,

and the Peace River Land & Development Company shall then refund all payments made by the purchasers."

Upon receipt of this bond, plaintiff continued to pay upon said bond according to its terms, until she paid the sum of $470.

The fraud upon which the plaintiff predicates her right to recover is found in certain maps, prints, catalogues, and other literature issued by the land company, in which certain representations and statements were made which she says proved to be false and untrue, and upon which she relied in making the purchase. The statements claimed to have been made in the literature on which fraud is charged, are to the effect that the land was generally rolling, with levelness, and compared favorably with Iowa and Illinois prairies; that the tract was traversed by good roads and telephones; had excellent drainage; the soil was sandy loam, with clay subsoil; was fertile to a degree almost beyond description; was increasing in value rapidly; was suitable for the growth of orange and grapefruit, and, if planted to orange and grapefruit, would be worth $1,000 an acre in four or five years; that the land was the choicest in De Soto County, and the choicest in the state of Florida; that homeseekers were flocking to that section to settle on the land; that all kinds of vegetables, and several crops each year, could be grown on the land with good returns. The land company published a plat, on which orange and grapefruit groves were shown, and on which was printed as follows:

"Note the improved orange and grapefruit groves adjoining our land. Some of the groves are producing $1,000 per year annually. We are selling identically the same kind of soil these groves are growing upon. All kinds of choice vegetables may be grown in abundance on the same land."

Plaintiff alleges that, in order to have its representa-

tions believed, and relied and acted upon, the defendant
distributed a picture, showing a high and rolling piece of
land, on which was printed, "The above picture shows the
land we sell."

The contention of the plaintiff is that the representa-
tions were false; that they were known to be false at the
time the literature was issued by the defendants; that
the defendants knew the representations were false, and
made them for the purpose of having plaintiff rely there-
on; that they were made as of the personal knowledge of
the defendants; that she believed they were true, and
acted and relied upon them; that the land allotted to her
was not in any sense of the character described; that, after
discovering the fraud and deceit by which she was induced
to enter into the contract, she gave notice of rescission,
and demanded the return of her payments, which was re-
fused.

The literature in question was introduced in evidence,
and contains the statements alleged to have been made
therein. There is evidence that these allegations were not
true; that the land allotted to the plaintiff was low, cov-
ered with tangle, live oak trees and gum; is from two to
five feet lower than the land north of it; that the whole
country is flat and low; that the piece allotted to plaintiff
is a low, flat swale, that acts as a creek or overflow for
the country lying to the east and north,—seems to be just
a piece of low ground; that the east 20 has a pond on it
that will cover between 60 and 75 per cent of the ground;
that at times there was water on it two feet deep, covering
half of it; that there is not to exceed two or three acres
of the Dimond ground upon which there is no water;
that the west half is just boggy,—"you jump from bog to
bog."

A witness for the plaintiff, who examined the land in
February, 1912, was asked this question:

"Are you able, from an examination of the land, to tell whether or not it is suitable for the growing of citrus fruits? A. I am. Q. How do you go about to examine Florida land to tell what it is? A. The best way is to take a shovel and to dig a hole, and if there is a sand soil, and no water or hard-pan, and the proper drainage, you have no trouble in growing oranges on it. I dug between 50 and 200 holes on the property. I think I dug some holes on the Dimond land. . I found little top soil and white sand; in some of the holes, I found water."

He said that it was not possible to grow citrus fruit upon the Dimond land except on two or three acres.

"If you dig a hole, you find no soil,—nothing but sand, —no subsoil. All the land owned by the company was not of the same quality. They owned land upon which citrus fruit can be raised. I didn't find any of defendants' property which compared favorably with Iowa and Illinois as to be rolling or in soil. The land was flat and level, about 90 per cent flat and low. The Dimond land had no drainage. The outlet would be between three and four miles up Peace Creek. I found that the water had been higher than it was when I was there. I could see trash and refuse on the high ground. At the time I was there, there was trash on the trunks of trees as high as a man's head. The trash would indicate that the water had been two to four feet high. The east half of the Dimond land could be cleared for little expense, and the west half would cost from $100 to $140 an acre. I didn't find any clay soil or sandy loam on the Dimond land. I should say vegetables could not be raised on the Dimond land. I didn't see any vegetables on any other land around there. I saw the Dimond land twice, in 1912 and 1913. In 1913, it was covered with water, just the same as it was when I saw it in 1912."

He further testified that he did not believe that any-

thing .could be grown on the Dimond land, except on the ground in the northeast corner, unless it was drained.

Dr. Dimond, who visited the land in February, 1912, and July, 1914, testified to substantially the same thing.

There was evidence from which the jury could find this was not as represented. In the literature issued was the following statement, made by the defendant E. O. Montgomery, president of the company:

"I, as president of the Peace .River Land & Development Company, wish to say to every reader of this book that the lands herein described are, according to my personal judgment, the very best fruit, trucking, and all purpose land to be found in the entire state of Florida. After carefully inspecting several thousand acres in other portions of the state, I selected this tract on account of its superior adaptability for the successful growing of citrus fruits, garden, and agricultural products. The soil is dry and of a sandy loam, with most excellent drainage facility. The land is sold on a positive guarantee that it is just what we represent and claim for it. Land values are increasing very rapidly in Florida, and never again will you have the opportunity of buying good lands for the extremely low prices that we are now offering it for. A careful study of the following pages will convince you of the truth of our claim."

Signed, E. O. Montgomery, and issued as a preface to the circulars upon which plaintiff claims she relied in making the purchase.

1. FRAUD: acts constituting fraud: asserting truth of that of which one has no knowledge.

We think there is abundant evidence that the representations made were false, in so far as the land allotted to the plaintiff was concerned. Upon this point, the evidence is in sharp conflict; but there was clearly a jury question, which has been settled adversely to the defendant. Is there evidence that defendants knew

that these representations were untrue?

It appears that the defendant Montgomery visited this land a short time before the corporation was organized, and purchased it for $3.50 an acre; that he returned to Iowa and organized the defendant corporation, and himself became president of the corporation; that the purpose of the corporation was to sell this land so purchased by Montgomery; that these circulars with these extravagant statements were issued by the company of which Montgomery was president; that his name appears in said circulars, guaranteeing the correctness of the statements, asserting over his name that the lands described in the circulars are. to his personal judgment, the very best, etc., and asserting that, after careful inspection of several thousand acres in other portions, he selected this because of its superior adaptability for successfully growing, etc. This circular was sent by the land company to plaintiff on her request. It was addressed to prospective purchasers, evidently intended to be used by the company for the purpose of having it believed that the facts therein stated were true. The plaintiff received these circulars and this literature from the defendant company. The statements therein were made as of facts within the knowledge of those issuing the circulars. No one can read this record without feeling certain that these circulars were issued by the company with the knowledge of Montgomery, for the purpose of influencing purchasers and effectuating the sale of the land.

Did the plaintiff rely upon them in making the purchase? She said she did. She received them and read them, and was impressed by their contents. She is not able to point out, perhaps, any particular matter set out that induced her to make the purchase, or upon which she relied in making the purchase; but that the circulars were the inducing cause of the purchase, cannot be denied. True,

some of the statements in the circulars were

2. FRAUD: evidence: interwoven statements of fact and opinion.

merely matters of opinion; but those were so interwoven with the fact statements relied upon that it would be difficult to analyze and separate the influence that one or the other had upon the mind. Actionable fact statements were in this literature, and all that was said was rightly to be considered in connection with the fact statements in determining the effect upon the mind. We think the facts stated therein, so far as the land allotted to the plaintiff was concerned, were untrue; that the defendants knew, or should have known, that they were untrue. If they did not know that they were true, they made them recklessly and carelessly, for the purpose of inducing action thereon, and cannot be allowed to fall back on the claim that they did not actually know they were untrue. The false assertion of a fact as true, with the intention that it shall be accepted as true, relied upon and acted upon, is just as harmful, when acted upon, as if the party, at the time of making the statement, knew it was untrue. When one falsely states that to be true which he does not know to be true, for the purpose of inducing another to rely upon it and act upon it, he is just as guilty of actionable fraud, in the event he is accepted at his word, as if he knew at the time that it was not true. One cannot falsely state a fact to be true as of his own knowledge, about which he has no knowledge, for the purpose of inducing another to act, and then, when action follows, escape liability on the mere showing that he did not know the fact to be untrue at the time he made the statement. When one asserts a fact in order to induce action on the part of another, it is rightly assumed that he has knowledge of the fact about which he makes the positive assertion, and when it is acted upon, cannot be heard to say that he did not know, at the time he asserted the fact, that it was untrue, and escape liability.

So we say that this record discloses that defendants were responsible for the issuing of these circulars; that the plaintiff received them, read them, relied upon them, and was induced to make the purchase; that, so far as this land is concerned, it is shown that the representations were not true. So we say, upon the fact issue here tendered, that the plaintiff was justified in rescinding the contract, provided, however, she acts in time. Upon the issue tendered and the facts shown, the jury returned a verdict for the plaintiff for $520. From judgment on this verdict so rendered, defendant appeals.

Under its brief points, the defendant asserts that the verdict is contrary to the evidence. This point cannot be sustained, for the reasons hereinbefore set out. It is not asserted that the verdict is contrary to the instructions given. It is said that there is no competent evidence that Montgomery knew the allegations were false, and that, without proof of actual knowledge of the falsity, he cannot be held.

He testified:

"I have been over the land generally eight or ten times. Was over it first in 1910. I have been over the holdings of the land company in a general way eight or ten times since 1910. I was over it before we purchased it"—thus showing a knowledge of the land concerning which the circulars were issued. He was president of the company that issued these circulars. The request for the circulars was sent to the company. The company was engaged in selling this land. It would be straining credulity to believe that neither the company nor Montgomery, as president, knew of these circulars and their contents. The jury was clearly justified in finding against defendant on this proposition.

3. APPEAL AND ERROR: who may allege error: invited error.

Assuming that there was a fair controversy as to the actual knowledge of Montgomery that the representations were not true as made, it is contended that the court erred in saying to the jury,— as it did in the

sixth instruction, exceptions to which were preserved,—
that, if the statements were recklessly made, not caring
whether the same were true or not, then the defendant
would be liable, the same as if they were made with knowl-
edge of the falsity of the representations. The court said,
in this sixth instruction, that, in order to hold the defend-
ant Montgomery liable for any loss or injury occasioned,
it must be shown by the evidence that the representations
were made by him with knowledge that the statements were
false; or that they were made by him recklessly, not car-
ing whether the same were true or false, and made with the
purpose and intent to deceive; that the person relied upon
the representations as made, believing them to be true,
acted upon them and was damaged. The contention is that
the defendant cannot be made liable for statements made
as of his own personal knowledge, unless it is shown affirm-
atively that he knew, at the time they were made, that
they were not true.

We might dispose of this controversy at once by saying
that the defendant asked an instruction substantially the
same as given. The instruction requested was to the effect:

"There cannot be fraud entitling a recovery unless the
person charged with the fraudulent representations knew
the falsity of the statements at the time they were made,
or recklessly made such statements without such knowledge,
intending that the plaintiff should believe that he had
such knowledge."

The rule as laid down by the court was substantially
the same as that asked, and the defendant, having asked,
cannot complain of the giving.

That Montgomery assumed to make these representa-
tions of his own personal knowledge, appears in the litera-
ture itself. In this literature, he represented that the state-
ments therein were true, of his own personal knowledge. He
assumed to know the land to be as represented. He says:

"After carefully inspecting several thousand acres in

other portions of the state, I selected this on account of its superior adaptability for the successful growing of citrus fruits, etc."

The things about which the representations were made were susceptible of actual knowledge,—knowledge that could be gained by inspection. He claimed to have inspected the land. He claimed to have investigated it touching the matters concerning which the statements were made.

We have had occasion recently to pass upon this same question, in the case of *Davis v. Central Land Co.*, 162 Iowa 269. In that case, a motion for a new trial was made, upon the ground that the evidence was insufficient to warrant a finding that the defendant had knowledge of the falsity of the fact alleged. The rule was laid down that, if one represent to a purchaser, as of his own knowledge, a material fact, and thereby induce the purchaser to act upon it as true, he is liable on the ground of fraud for the damages sustained. The rule is recognized that:

"The charge of fraudulent intent in actions for deceit may be maintained by proof of a statement made as of a party's own knowledge which is false, provided the thing is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge, in which case it is deemed that the fraud consists in stating that the party knows the thing to exist when he does not know it to exist, and in such cases a belief in its existence will not warrant or excuse a statement of actual knowledge."

It is said that:

"One who makes a representation without knowing whether it is true or false, is, in morals and in law, as blamable as if he had made it knowing it to be false."

In that case it is further said:

"The fraud alleged consisted in the reckless assertion as true that of which the party knew nothing which was definitely ascertainable, and in deceiving the other party thereby."

This case seems to have been well considered, and the authorities are collated supporting the proposition.

We might say, in passing, that, ordinarily, in a case of rescission and an action brought to recover the money paid, no proof of *scienter* is necessary.

Brief points 3, 4, 8, 9, 10, 11, 12, and 13, all relate to errors alleged to have been committed by the court in the giving of instructions. These we cannot consider, for the reason that, at the time of the trial, Section 3705-a of the Supplement to the Code, 1913, was in force, and reads:

4. APPEAL AND ERROR: reservation of grounds: instructions: failure to object at trial.

"All requests for instructions must be presented to the judge before the argument to the jury is commenced and before reading his charge to the jury. * * * All objections or exceptions thereto must be made before the instructions are read to the jury and must point out the grounds thereof specifically and with reasonable exactness; but upon a showing in a motion for a new trial that an error in such instructions was not discovered by the party claiming the error at the time of trial, such objections or exceptions may be made in the same manner in such motion for a new trial," etc.

Before the reading to the jury of these instructions complained of, no exceptions or objections were taken by the defendant; nor did counsel call the court's attention to any errors, if any there were, such as are now complained of. It is claimed, however, that, in the motion for a new trial, the objections now urged were called to the attention of the court and passed upon. Whether they were passed upon or not does not appear from this record. There was no "showing" made in the motion for a new trial that the errors were not discovered at the time of the trial, by the party claiming the error, and we must assume that they were not considered by the court in passing on the motion

for a new trial.   Without a showing, the court was not
called upon to pass upon these objections urged at that
late hour.   The purpose of the statute is to require counsel
to assist the court in stating correctly to the jury the law
of the particular case;   and, if counsel discovered in the
instructions error of which complaint can reasonably be
made, and upon which a new trial would or should be
granted, it is the duty of counsel to then call the court's
attention to the error, or forever after hold his peace.   But
if he does not discover it until after the instructions are
read, he then may make a showing excusing his dereliction,
and avail himself of the errors in the instructions, if any
there are.   It is not sufficient for counsel to say, "We over-
looked them."   There must be a showing of excuse.   This
matter has been recently and directly passed upon by this
court in *Chumbley v. Courtney,* 181 Iowa 482.   In that case
it is said that, in order that an objection or exception to an
instruction raised for the first time in motion for a new
trial may be considered, the mere assertion that the error
was not discovered by the party claiming it at the time
of the trial is not enough, and there must be some showing
that the assertion is true, and some proof thereof.   This
may be by affidavit, testimony in open court, or any mode
which will make it satisfactorily appear to the court that
the error was overlooked at the trial of the cause.   This was
not attempted in this case as to the instructions complained
of in these several brief points.   We therefore do not con-
sider them in the disposition of this case.

5. APPEAL AND
ERROR : who
may allege er-
ror : error
against
non-complain-
ing party.

It is next contended that the court
erred in giving the statement of the law as
found in Instruction 6, which was duly ex-
cepted to.   The exception involves the
thought that the court told the jury that,
in an action for fraud, the fact that the land was of less
value than the purchaser agreed to pay for it is material to

be considered in determining whether or not fraud was practiced which entitled her to rescind. That thought is not involved in the instruction. The instruction proceeds to tell the jury that, in case they find by a preponderance of the evidence that the defendant caused to be printed and circulated the prospectus or catalogue offered in evidence, that the representations made in said literature were false, known to the defendants to be false, or were made recklessly, not caring whether the same were true or not, that they were made with intent to have prospective purchasers of the land rely upon them, that the plaintiff read the representations made in the catalogue, purchased the land in controversy in reliance thereon, and that the land is of less value than the amount she contracted to pay therefor, "then in that case you should find for the plaintiff as against the defendant." That, if all the other matters were shown, she could not recover if she failed to show that the value of the land in controversy is less than the amount she contracted to pay therefor.

It is true that, if the false representa-

6. VENDOR AND PURCHASER: rescission: value of land as affecting rescission.

tions were made, as charged, if they came to the knowledge of the plaintiff, if she relied upon them, and made her purchase relying upon them, if the representations were false, and the land was not as represented, she would be entitled to rescind, and recover the purchase price, even if the land were of the value which she contracted to pay for it. The instruction was prejudicial only to the plaintiff. By this instruction she was prevented from rescinding and recovering, notwithstanding the fraud practiced upon her, if the land she received was not less in value than the amount she agreed to pay therefor. That is, if all the other elements were found in her favor, she could not rescind unless the land was of smaller value than she agreed to pay for it. Now her right to rescind did not depend upon the

value of the land, but upon the truth of the representations made to her, through which the sale was consummated. She could have rescinded though the land was of equal value, if not as represented, because of the fraud practiced upon her, inducing the purchase. Though the instruction is not good law, we hardly see where any complaint can be lodged against it on the part of the defendant. It surely did not operate to the prejudice of the defendant. The party purchasing is entitled to what he buys, and is entitled to have it of the character represented, and is not bound to take it and hold it, even though it is not of smaller value than the amount agreed to be paid for it.

7. EVIDENCE: relevancy, competency, and materiality: subsequent condition of thing.

It is next contended that the court erred in the introduction of testimony; that it allowed witnesses to testify to conditions there at a date a year later than the date of the contract. The conditions testified to were shown to be of a permanent character, changeable only by the hand of man. Conditions that existed in 1912 must, in the nature of things, have existed at the time the contract was made. It is contended that there was no showing that the conditions were the same. The very character of the thing about which the testimony was offered shows that in its nature it was not changeable, and we think there was no error in this. It related to the topography of the land and the character of the soil—all things of permanent character and not changeable.

8. TRIAL: reception of evidence: noncompetent opinions: waiver.

It is next contended that the court erred in permitting the witness Dr. Dimond to testify that the land in controversy could not be drained. The record discloses no such question asked. The question was: "What did you see, from your observation and the manner in which the water stood as you said, whether there was drainage for their land or not?" No objection was made to

the competency of the witness. The objection urged was
that it called for the opinion and conclusion of the witness.
The answer was: "There was no drainage. Neither was
there drainage on Mrs. Dimond's land. I made no obser-
vation to determine how far you would have to go for an
outlet." No motion was made to strike the answer. The
question called for his observation touching the character
of the land as to drainage. The question did not call for
the opinion of the witness, but for his observation—what
he saw. "What did you see when there whether there was
drainage or not?" The answer may have been in the na-
ture of an opinion. No motion was made to strike it out.
The question being proper, defendant cannot complain of
the answer, to which no objection was urged.

It is next contended that the court
9. WITNESSES:
cross-examin-
ation:   allow-
able scope:
values.
erred in permitting the plaintiff, on cross-
examination of one of defendant's witness-
es, to inquire as to the number of acres sold
to defendant, and the price paid therefor.

The witness resided in the neighborhood of this land.
On direct examination, he said he was acquainted with the
land in dispute; had examined it thoroughly; testified to
its drainage and its adaptability for citrus fruits; de-
scribed the soil; stated what kind of field and garden fruit
could be grown upon it; gave its market value in 1911 and
its present value. On cross-examination, he was asked the
following question:

"How many acres of land were sold by your firm to
E. O. Montgomery, and what was the price? A. Ap-
proximately 14,000 acres, at $3.50 an acre."

He further testified, on cross-examination, that his firm
purchased the land in 1908, at $3.50 an acre. This was
competent, as bearing on his testimony touching the value
of the land at the time it was sold to the plaintiff, in 1911.
He had testified on direct examination that the reasonable

and fair market value of the land on the 28th day of February, 1911, the time when plaintiff purchased it, was $20 to $30 an acre, and that at the present time, when he was testifying, it was worth $35.00 to $50.00 an acre. On cross-examination, the defendant was permitted to show by this same witness that, in 1908, his firm paid $3.50 an acre, and that, in 1910, his firm sold it to Montgomery at the same price. The defendant evidently considered it important that the jury should have from this witness his opinion of the value at the time it was sold to the plaintiff, and its present value. They called this witness to give this to the jury. The cross-examination was to test the correctness of his judgment, by showing that he purchased it in 1908 for $3.50, and, a year before it was sold to the plaintiff, sold it to this defendant at the same price per acre. This was proper on cross-examination. See *Wiley v. Dean Land Co.,* 171 Iowa 75.

It is next contended that the court
10. APPEAL AND erred in refusing to give instructions asked
ERROR: re-
view, scope of: by the defendant. These instructions in-
law of case.
volved the effect to be given to the provisions in the bond for a deed, in which it is claimed that the plaintiff was limited to 90 days for inspection, and that, after 90 days, her right to rescind was foreclosed.

On this point the court instructed the jury as follows:

"With regard to the claim made by the defendant to the effect that, by reason of the provision of Paragraph 8 of the bond for warranty deed, providing that the purchaser shall have 90 days from the date of sale in which to investigate the land therein described, and that if, upon such investigation, the purchaser shall find that said land was misrepresented, that the defendant would then refund all money received by it to the purchaser, and the claim by the defendant that the plaintiff did not investigate said land within the 90 days, and that, by reason of such fact, she

Vol. 182 IA.—27

waived her right to claim a return of the money she had paid said defendant, and that she is estopped now from claiming the same, you are instructed that, if you find, by a preponderance of the evidence, that said defendant made the representations in their prospectus and literature as charged in plaintiff's petition, and that such representations with regard to the land therein mentioned were false and untrue, and were made with the intent and purpose of deceiving prospective purchasers of said lands, and that the plaintiff, as such prospective purchaser, read such representations and statements with regard to said land, and believed them to be true, and relied upon them and purchased said land to her damage, then, in that case, the provision in said contract, in Paragraph 8 thereof, to the effect that the purchaser should have 90 days from the date of said contract to investigate the land, and the claim of this defendant that the plaintiff failed to comply with such provision of said contract, will constitute no defense in this case, and you are instructed that it is the law that, if you so find, then the plaintiff has not waived her right to claim the return of her money so paid on said contract, and is not estopped, by reason of said provision of said contract, from claiming the same in this case."

This instruction was not excepted to, and it is not claimed that it was not submitted to the defendant for its consideration before it was given. No complaint of this instruction is available to the defendant in this court. It is the law of the case.

The defendant, however, before giving the instruction, requested the court to say

11. TRIAL: instructions: non-applicability to evidence.

to the jury on this point that, if the plaintiff was given an opportunity within 90 days to inspect the land selected for her by the defendants, if the selections so made did not suit her, and if she was given the privilege of exchanging said land so se-

lected for other and of her own choosing, and if she did not exercise ordinary prudence and diligence in ascertaining whether or not the land so selected for her by the defendants was as represented to her by said defendants, but continued to make payments on her contract of purchase after the expiration of said 90-day period, "then, in that event, if you so find, plaintiff cannot recover."

It will be noted that this instruction does not raise the question. Plaintiff was under no obligation, under her contract, to take any other land than that called for by her bond. If that land was not as represented, she had a right to rescind.

12. TRIAL; instructions: requested instructions: non-contested facts.

In the ninth instruction, the defendant attempted to raise this question; but the instruction was rightly refused, as requested, for the reason that it called upon the jury to ascertain and determine facts about which there was no controversy, and was properly denied.

The instructions asked were properly refused; and, inasmuch as the defendant took no exception to the instructions given, it became the law of the case, and is binding upon the defendants, whether right or wrong.

Some other matters are discussed in argument; but we do not deem them important in this case, and therefore do not discuss them in this opinion.

Upon the whole record, we think the judgment of the court was right, and the same is—*Affirmed.*

PRESTON, C. J., LADD, EVANS, and SALINGER, JJ., concur.

SALINGER J. (concurring).—I agree to the result. In my opinion, so much of the argument as is that, if one recklessly affirm he knows an article is as represented, and does not know it, and so affirms to induce the owner to act, this established he is guilty of knowing that the article was not as represented, is erroneous. I think that he is responsible, but for the reason that he knew that his af-

firmation of personal knowledge was false—not because he knew the representation of quality was false. Perhaps the reckless assertion of the falsehood of personal knowledge is evidence of *scienter* in making the false representation of quality, but it is not more than that. This means that an allegation of *scienter* in misrepresenting quality is not supported by reckless and false representation of having personal knowledge of quality. But, as no point is made urging the distinction, the result reached is correct.