In the Matter of the ARBYCRAFT CO., Debtor.

Appeal of Bornot DEHON, Creditor.

No. 13370.

United States Court of Appeals Third Circuit.

Argued Dec. 15, 1960.

Decided March 27, 1961.

States, 9 Cir., 1960, 282 F.2d 818, at pages 821–822.

---

7. And see: Brooks v. United States, 5 Cir., 1947, 164 F.2d 142; Daily v. United

Reuben Singer, Philadelphia, Pa., (Meade & Singer, John R. Meade, William J. Campbell, Philadelphia, Pa., on the brief), for appellant.

Nathan Lavine, Philadelphia, Pa., (Adelman & Lavine, Melvin Lashner, Philadelphia, Pa., on the brief), for Debtor.

M. E. Maurer, Philadelphia, Pa., for Receiver.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

This is an appeal from the reversal by the District Court of the Order of the Referee in Bankruptcy allowing as an administration expense of the Receivers a bill for repairs to a boiler on the premises leased to the debtor, and occupied by it at the time during the pendency of a Chapter XI, 11 U.S.C.A. § 701 et seq., proceeding.

The Referee, in his Opinion, based his disposition on his conclusion of law that the tenant was liable for the repairs under the terms of the lease and his finding that the "tenant" in his capacity as agent for the Receivers in the conduct of the business, had acquiesed in the making of the repairs.

The District Court reversed the Referee's Order and disallowed the landlord's claim. It premised its action on its view that the Referee had erred in concluding "as a matter of law that the tenant [debtor] was liable under the terms of the lease for the cost of the repairs", and its further determination that the Referee had erred in his finding as to acquiescence.[1]

The critical facts may be summarized as follows:

In November, 1959, the Arbycraft Co. ("debtor") filed a petition for arrangement under Chapter XI of the Bankruptcy Act. Receivers were appointed and authorization granted to them to operate debtor's business[2] and to employ any of its personnel in the course of such operation. Pursuant to the authorization stated the Receivers employed debtor's executive vice-president, Girard Esayian, to operate the business.

Debtor's business was conducted in a building which it had leased in March, 1956. The lease[3] in effect at the time the events pertinent here transpired, contained the following clauses:

"8(b) Lessee covenants * * * that he will * * * repair all damage to plumbing and to the premises in general; keep the same in good order and repair as they are now,

---

1. The Opinion of the District Court is unreported.

2. Debtor manufactured and sold kitchen ware at its place of business, 1642 Fairmount Avenue, Philadelphia, Pa.

3. The lease was "Form 50" customarily used in Pennsylvania.

reasonable wear and tear * * * excepted."

"13(e) In the event of the failure of Lessee promptly to perform the covenants of Section 8(b) hereof, Lessor may go upon the demised premises and perform such covenants, the cost thereof * * * to be charged to the Lessee. * * *"

On January 19, 1960, the boiler in use on the leased premises failed to function and Esayian telephoned one Harry M. Rommel, who was the real estate agent of the landlord, Bornot Dehon, to acquaint him with the situation but Rommel was out of his office. Subsequently (the record does not disclose the date) Rommel returned Esayian's call.

Thereafter, Esayian engaged the Triple A Welding Service to perform such work as might be necessary to get the boiler back in operation. While the Triple A men were at work employees of C. Rodney Morris and Son, Inc., appeared and advised Esayian they had been instructed by Rommel to work on the boiler.

With reference to the foregoing incident, Esayian testified as follows: (Hearing before the Referee, February 25, 1960).

N.T. p. 17

"Q. While these men from Triple A were working, did another company come in and tell them to go away; dismissed them because the owner of the building had instructed them to do some work on this boiler? A. Yes, sir.

"Q. And did they then do work on this boiler? A. This other company took over, yes.

"Q. And what did they do? A. They replaced all of the tubes in the boiler. * * *"

N.T. pp. 18–19

"Q. And your Company, neither you nor anyone else from your Company, ordered Rodney Morris and Company to do that work? A. To my knowledge I never heard of Rodney Morris.

"Q. And as you testified, you didn't ask the landlord to do that? A. That's right." (Emphasis supplied.)

C. Rodney Morris testified to the effect that the work done by his men on the boiler was in the category of "repairs".

The February 25, 1960 hearing was held as the result of presentation to the Bankruptcy Referee, as costs of administration, a bill of $119.60 from the Triple A Welding Service for its services; and another for $1,133.00 by the Morris firm for its work. Counsel for the debtor objected to the payment of the Morris bill as an administration expense on the grounds that (1) the work done on the boiler was not "repairs" but a "replacement of the essential elements of the boiler [tubes]," and accordingly the debtor (as lessee) was not liable under his lease, and (2) the landlord acted as a "volunteer" in engaging Morris to do the work on the boiler "and there is no provision in the lease * * * which gives the landlord the election to repair and charge it to the tenant."

Following the hearing, the Referee rendered his Opinion and Order in which he made the fact-findings that the work done on the boiler constituted "repairs" and that Esayian had acquiesced in their performance by Morris, and stated "I concluded as a matter of law that the tenant would be liable under the terms of the lease for this bill." The Referee further found that the debtor's estate was liable for the payment of the Morris bill as an expense of administration since Esayian, acting within the course of his employment, by the Receivers to manage debtor's business, had acquiesced in the performance of the repairs by Morris.

It may be noted parenthetically that no evidence was offered by the Receivers or the debtor at the hearings with respect to the Morris bill. It must further be observed that, while the Referee and the District Court in their opinions referred to the Morris bill as the "claim" of the landlord, and the parties have continued to do so on this appeal, the record discloses that the landlord never paid the

Morris bill and that it was presented to the Receivers as a claim of Morris.

The District Court, in its Opinion, agreed with the Referee's finding that the work on the boiler constituted "repairs" but reversed his allowance of the Morris bill for these reasons:

"We find no evidence here from which the Referee could have reasonably concluded that the tenant 'acquiesced' in the landlord's contractors performing his obligation to repair the boiler *in the sense that he agreed to be responsible for the cost of the work*. Nowhere in the record is there testimony that the *tenant* 'sent his workmen away' [as found by the Referee]. \* \* \* The only sense in which the debtor-lessee could be reasonably said to have 'acquiesced' here is that Mr. Esayian apparently did not protest when the landlord's contractors told the Triple A men to leave.

"We think that as a matter of law the debtor-lessee's failure to protest when his repairmen were dismissed by the landlord's repairmen, or his failure to refuse to allow the landlord's contractors to finish the repairs, should not render the lessee liable for the cost of replacing all the tubes in the boiler. The lessee's failure to protest should not amount to an agreement to pay this bill, particularly in the absence of proof that the lessee agreed to the very extensive repairs performed by the landlord's contractors. The landlord cannot be permitted to arbitrarily create an obligation on the part of the tenant to pay the cost of repairs ordered by the landlord."

The District Court, in reversing the Referee, noted that a referee's fact-findings cannot be reversed unless "clearly erroneous" under General Order in Bankruptcy No. 47, 11 U.S.C.A. following section 53, implemented by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.[4] It stated, however, that it was not bound by the "clearly erroneous" rule because "we consider the issue here to be one of mixed fact and law—namely, whether the debtor-lessee's conduct amounted to an agreement to pay the cost of the repairs performed by the landlord's contractors."

The District Court further held that "where findings of fact are conclusions based upon uncontradicted testimony from a witness whose credibility is not challenged, the reviewing judge can draw his conclusions from such testimony as well as the referee, and the reviewing judge need not be quite as reluctant to disturb the referee's findings."

We are of the opinion that the learned District Court erred in substituting its "conclusions" for the Referee's factual determination.

■ The Referee's determination that Esayian "acquiesced" in the performance of the repairs made by Morris is in the nature of an ultimate finding of fact and not a determination of an issue of "mixed fact and law". It is, of course, well-settled that an ultimate finding of fact by a Referee may be reviewed by the District Court, or any appellate court, free of the impact of the "clearly erroneous" rule applicable to ordinary findings of fact, In re Pioch, 3 Cir., 1956, 235 F.2d 903, 905, but that does not mean that a reviewing court may substitute its own ultimate finding of fact for that of the Referee if the evidence on which the Referee's finding is based measures up to the applicable standard of legal proof. In re Kaufhold, 3 Cir., 1958, 256 F.2d 181, 185.

Otherwise stated, if there is reasonable basis in the record for a referee's ultimate finding of fact a reviewing court cannot reverse it and substitute its own ultimate fact-finding simply because it regards its view as effecting a more de-

4. Rule 53(e) (2) of the Federal Rules of Civil Procedure, not adverted to by the District Court, also requires a district court to accept a bankruptcy referee's fact-findings unless "clearly erroneous".

sirable result than that reached by the referee.[5]

In the instant case the testimony of Esayian affords ample basis for the Referee's fact-finding that Esayian acquiesced in the performance of the repair job by Morris. When Morris' men, in the presence of Esayian, told the Triple A crew that it was taking over the repair job, Esayian, according to his testimony, stood by and permitted the Triple A men to depart and the Morris men to "work on the boiler". That this is what happened is not disputed.

It is settled law in Pennsylvania that a tenant required by his lease to keep the leased premises, or any of its appurtenances, fixtures or equipment, in "good repair" must perform his obligations, and that when he fails to do so the landlord may make the repairs and recover their cost from the tenant. The Referee's finding here that the work on the boiler was "repair", is not disputed on this appeal. Esayian's own testimony established that he had sought to have the landlord make the repairs and that the landlord (via his agent) engaged Morris to perform them. Assuming even that Esayian thought the landlord's performance of the repairs would relieve the debtor from the cost of making them, Esayian's misconception of his obligation to make the repairs or pay for them if made by the landlord, would not operate to absolve the debtor from an obligation imposed on it by law under the terms of its lease.

We express the further view that the Referee correctly held that the Receivers were liable for payment of the Morris bill as an expense of administration on the ground that its employee Esayian, acting within the scope of his employment, acquiesced in the performance of the repairs by Morris.

For the reasons stated the Order of the District Court reversing the Referee's Order disallowing payment of the Morris bill will be reversed and the cause remanded with directions to the District Court to proceed in accordance with this Opinion.

---

5. In Hoppe v. Rittenhouse, 9 Cir., 1960, 279 F.2d 3, at page 9, it was said with respect to the scope of review of ultimate findings of fact by a bankruptcy referee:

"[W]here the basic and undisputed facts *are fairly susceptible of diverse inferences requiring different conclusions*, the determination made by the trier of fact is conclusive on review unless that finding is 'clearly erroneous'." (emphasis supplied).