**M. W. O'RIELEY, Trustee in Bankruptcy
of Woerderhoff Shoe Co., Inc.,
Appellant,**

v.

**ENDICOTT–JOHNSON CORPORATION,
Appellee.**

No. 16573.

United States Court of Appeals
Eighth Circuit.

Nov. 30, 1961.

Thomas M. Collins, Cedar Rapids, Iowa, made argument for the appellant, and was on the brief.

Meyer M. Kahn, St. Louis, Mo., made argument for the appellee. Bryce M. Fisher, Cedar Rapids, Iowa, was with him on the brief.

Before VOGEL and BLACKMUN, Circuit Judges, and BECK, District Judge.

BLACKMUN, Circuit Judge.

This appeal involves a reclamation petition filed by Endicott-Johnson Corporation for shoes sold and delivered to Woerderhoff Shoe Co., Inc., prior to the latter's bankruptcy. Woerderhoff filed a voluntary petition in bankruptcy on November 17, 1958, and included Endicott in its list of unsecured creditors. It was adjudged bankrupt two days later. The present petition alleges the rescission of the shoe sales as of November 14 and the surrender of the shoes by the bankrupt to Endicott. By agreement of the parties, the merchandise has been sold and the proceeds are now held subject to the disposition of this controversy. Those proceeds are less than the amount the bankrupt owed Endicott at the time of bankruptcy.

The referee dismissed the petition to reclaim. The District Court reversed and granted it. 184 F.Supp. 479. The Trustee has appealed.

The bankrupt had been in the retail shoe business in Cedar Rapids, Iowa, since about 1946. It operated two stores there. One bore the corporation's own name and was known as the uptown store. The other did business as the South Side Shoe Store. Endicott and the bankrupt maintained separate accounts for the two stores but the bankrupt's operation was a single business. A. L. Woerderhoff was the bankrupt's president and treasurer and he was an experienced businessman.

Endicott had done business with the bankrupt for about three years. By 1957 it was supplying approximately 80% of the shoes sold by the South Side outlet but less than this at the uptown store. Endicott had allowed the bankrupt a line of credit of approximately $8,500. This was on a budget plan basis. The

bankrupt submitted financial statements to Endicott. It also delivered to Endicott signed but otherwise blank checks. As the bankrupt placed orders for shoes and as the shipments were made, Endicott would fill out the checks, with amounts determined by formula, and deposit one of them each week for payment. Once the established credit limit was reached, Endicott would ship no further merchandise until a working margin under that limit had again been established. On occasion, one of these weekly checks would be returned unpaid. This, however, was not a matter of great concern to the parties but was attributed to a poor week in the bankrupt's business; the returned check would be presented again for payment or replaced.

Of prime importance in this case are the bankrupt's financial statements for its fiscal years ended January 31, 1957, and January 31, 1958, respectively. Its 1957 statements, consisting of a balance sheet and a profit and loss statement, had been submitted to Endicott in August 1957 and bore the signature of A. L. Woerderhoff. In May 1958, pursuant to the request of Endicott's divisional credit manager, Endicott received from the bankrupt a profit and loss statement, also bearing Woerderhoff's signature, for fiscal 1958. Upon repeated request, it received in June of that year a balance sheet as of January 31, 1958.

The operating statements for the two fiscal years showed net income of approximately $5,400 and $4,200, respectively. The 1957 balance sheet showed a net worth for the bankrupt of about $56,800. The corresponding figure on the 1958 balance sheet was about $49,000. The 1957 balance sheet showed accounts payable of $17,399.50. The 1958 balance sheet showed accounts payable of $21,476.10. It is *stipulated* that these balance sheets (both of them) *"were materially incorrect, in that the amounts payable were substantially and materially understated"*.

The same understated accounts payable figure for 1957 also appeared in a Dun & Bradstreet report issued in October of that year with respect to the bankrupt and on figures submitted by the bankrupt. Endicott was a subscriber of Dun & Bradstreet. The same understated 1958 accounts payable figure also appeared in the bankrupt's federal income tax return filed for fiscal 1958.

Shipments of merchandise, for which it was not paid, were made by Endicott to the bankrupt in 1958. The first shipments, aggregating $1,821.41, went out from February 21 to April 7, 1958, inclusive. These were after Endicott's receipt of the bankrupt's fiscal 1957 financial statements but before it received the 1958 statements. All this merchandise went to the uptown store. The remaining shipments, aggregating $6,835.82, went out from July 21 through November 3, 1958; these went to the South Side outlet except for a shipment of $713.35 made September 8 to the uptown store and two other single pair orders sent there. These later shipments took place after Endicott's receipt of the fiscal 1958 statements. The shipments from February 21 to November 3 totaled $8,625.36 in net invoice value. It is this amount for which the bankrupt was indebted to Endicott at the time of bankruptcy.

The Trustee's position here is that Endicott, in order to reclaim, must establish that the bankrupt at the time of its purchases did not intend to pay for the goods *or* that the financial statements were false and fraudulent and Endicott relied upon them in granting credit and shipping the merchandise. The Trustee then asserts that Endicott has not established any of these facts.

Endicott claims that the bankrupt's written financial statements were materially and knowingly false; that Endicott justifiably relied upon them in extending credit and in making the shipments; and that its petition for reclamation must therefore be granted.

1. At the outset, we recognize that reclamation in bankruptcy is a positive remedy. It has been said that

" 'Reclamation proceedings are not favored, "except when accompanied with strict proof." ' " In re Triangle Shoe Mfg. Co., E.D.N.Y.1924, 7 F.2d 704, 707. The claiming creditor has the burden. Idem, p. 708 of 7 F.2d; In re Iowa Egg Co., S.D.Iowa 1951, 96 F.Supp. 390, 391–392; Collier on Bankruptcy (14th Ed.), Vol. 4, Par. 70.39[3], p. 1312. Fraud is not to be presumed. In re Wilson-Nobles-Barr Co., W.D.Wash., 1918, 256 F. 966, 968. See, also, United States v. Colorado Anthracite Co., 1912, 225 U.S. 219, 226, 32 S.Ct. 617, 56 L.Ed. 1063 and United States v. Wunderlich, 1951, 342 U.S. 98, 100, 72 S.Ct. 154, 96 L.Ed. 113.

2. We are immediately confronted with the question of the precise point of impact of the clearly erroneous rule. Rule 52(a), F.R.Civ.P., 28 U.S.C.A., reads in part:

"In all actions tried upon the facts without a jury * * * the court shall find the facts specially and state separately its conclusions of law thereon * * *. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. * * * "

General Order in Bankruptcy 37, 11 U.S.C.A. following section 53, provides that the federal rules shall be followed in bankruptcy proceedings "as nearly as may be". It has been held specifically that Rule 52(a) applies to bankruptcy proceedings. United States Machinery Movers v. Beller, 8 Cir., 1960, 280 F.2d 91, 94, cert. den. 364 U.S. 903, 81 S.Ct. 236, 5 L.Ed.2d 195; In re Rockford Baseball Club, 7 Cir., 1953, 201 F.2d 685, 686. But General Order in Bankruptcy 47 provides:

"Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous. The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

Where, as here, the district court rejects a referee's findings, is the clearly erroneous standard to be applied to the decision of the referee or to the reversing decision of the district court?[1]

Where this question has arisen, most federal courts of appeals have held that the standard is to be applied to the *referee's* findings. Morris Plan Industrial Bank v. Henderson, 2 Cir., 1942, 131 F.2d 975, 976–977; Phillips v. Baker, 5 Cir., 1948, 165 F.2d 578, 581; Hoppe v. Rittenhouse, 9 Cir., 1960, 279 F.2d 3, 7. See In re Skrentny, 7 Cir., 1952, 199 F.2d 488, 492, and In re Arbycraft Co., 3 Cir., 1961, 288 F.2d 553, 556. The Fourth Circuit appears to hold to the contrary. Mutual Savings & Loan Association v. McCants, 1950, 183 F.2d 423, 426–427.[2]

---

1. At this point, we note the provocative comments of Referee George A. Heisey of the District of Minnesota to the effect that General Order 47 relates to a special as distinguished from a general reference; that it has to do only with the situation where the referee acts as a special master and not as "the court" within the meaning of § 1(9) of the Bankruptcy Act, 11 U.S.C.A. § 1(9); and that reviewing judges "time and again" have misconstrued General Order 47 and assumed power to substitute findings of their own for those of the referee. 35 Journal of the National Association of Referees in Bankruptcy, p. 39 (April 1961).

2. See United States v. Twin City Power Company, 4 Cir., 1957, 248 F.2d 108, 112, cert. den. 356 U.S. 918, 78 S.Ct. 702, 2 L.Ed.2d 714. In Mountain Trust Bank v. Shifflett, 4 Cir., 1958, 255 F.2d 718, the court, while citing and applying the Mutual Savings case, reversed the district court's reversal of the referee. It has been said, accordingly, that the differences among the circuits may be more apparent than real. Comment, 32 Journal of the National Association of Referees in Bankruptcy, 120 (1958); Collier on Bankruptcy (14th Ed.), Vol. 4, Par. 70.39, footnote 38, p. 1312.

■ In any event, we hold, with respect to a matter of general reference (where no further evidence has been introduced) that in this circuit the clearly erroneous standard is to be applied to the referee's findings and not to those of the district court. Certain of our cases have evoked comment suggesting that this circuit leans away from the majority rule. See, for example, Mutual Savings & Loan Association v. McCants, supra, p. 426 of 183 F.2d; Stewart v. Ganey, 5 Cir., 1940, 116 F.2d 1010, 1013, footnote 1; Collier on Bankruptcy (14th Ed.), Vol. 2, Par. 25.30, footnote 23, and Vol. 4, Par. 70.39 [2], footnote 38, which cite and refer to Rait v. Federal Land Bank of St. Paul, 8 Cir., 1943, 135 F.2d 447, 451; Katcher v. Wood, 8 Cir., 1940, 109 F.2d 751; and In re Kansas City Journal-Post Co., 8 Cir., 1944, 144 F.2d 791, 807. Our adherence to the majority rule, however, was clearly indicated by Sanitary Farm Dairies v. Gammel, 8 Cir., 1952, 195 F.2d 106, 114, 118, and is evidenced, in practical result, by our holdings in, for example, Teasdale v. Robinson, 8 Cir., 1961, 290 F.2d 108, 116; Becker v. Shields, 8 Cir., 1956, 237 F.2d 622, 625; and Rasmussen v. Gresly, 8 Cir., 1935, 77 F.2d 252, 254.

■■ 3. Endicott's right to reclaim depends on its ability to rescind the shoe sales. This ability to rescind is to be determined by Iowa law. Collier on Bankruptcy (14th Ed.), Vol. 4, Par. 70.41[1], p. 1319; 6 Am.Jur. (Rev.Ed.), Bankruptcy, § 845.

■■ It seems clear that under Iowa law, as urged by the Trustee, a vendor may rescind a sale if the purchaser at the time of the sale did not intend to pay for the goods. Kearney Milling & Elevator Co. v. Union Pac. Ry. Co., 1896, 97 Iowa 719, 66 N.W. 1059, 1063.[3] This, however, is not the sole ground for rescission. It is also "well settled" in Iowa that rescission may be effected "where the buyer makes a false financial statement to induce the sale of goods, and the seller relies thereon and makes the sale". Endicott Johnson Corporation v. Shapiro, 1925, 200 Iowa 843, 205 N.W. 511, 512.[4] That these two stated grounds for rescission are separate, independent, and distinct is evident from Reid v. Cowduroy, 1890, 79 Iowa 169, 44 N.W. 351, 352.[5]

■ It is not necessary that the false representations be the sole inducement; it is sufficient if it is shown that "they were relied upon to some extent, and but for them the contract or deal would not have been made". Rorem v. Pederson, 1925, 199 Iowa 304, 201 N.W. 784, 786.[6]

4. We come down, then, to the basic question whether the referee's findings

3. And Oswego Starch Factory v. Lendrum, 1881, 57 Iowa 573, 10 N.W. 900, 905; Houghtaling v. Hills, 1882, 59 Iowa 287, 13 N.W. 305; Lindauer v. Hay, 1883, 61 Iowa 663, 17 N.W. 98; Phelps, Dodge & Palmer Co. v. Samson, 1901, 113 Iowa 145, 84 N.W. 1051, 1052; Deere v. Morgan, 1901, 114 Iowa 287, 86 N.W. 271; Vacuum Oil Co. v. Carstens, 1930, 211 Iowa 1129, 231 N.W. 380, 383. See Gillespie v. J. C. Piles & Co., 8 Cir., 1910, 178 F. 886, 888, 890–891, 44 L.R.A., N.S., 1.

4. And P. Cox Shoe Mfg. Co. v. Adams, 1898, 105 Iowa 402, 75 N.W. 316, 320; Morris v. Posner, 1900, 111 Iowa 335, 82 N.W. 755; Kuh, Nathan & Fisher Co. v. Glucklick, 1903, 120 Iowa 504, 94 N.W. 1105, 1106; John Blaul & Sons v. Wandel, 1908, 137 Iowa 301, 114 N.W. 899, 901.

5. And Franklin Sugar Refining Co. v. Collier, 1893, 89 Iowa 69, 56 N.W. 279, 280; Starr v. Stevenson, 1894, 91 Iowa 684, 60 N.W. 217, 219; P. Cox Shoe Mfg. Co. v. Adams, supra, p. 319, of 75 N.W., p. 402, of 105 Iowa; J. J. Smith Lumber Co. v. Scott County Garbage R. & F. Co., 1910, 149 Iowa 272, 128 N.W. 389, 392, 30 L.R.A.,N.S., 1184. See Manly v. Ohio Shoe Co., 4 Cir., 1928, 25 F.2d 384, 385, 59 A.L.R. 413.

6. And Dashiel v. Harshman, 1901, 113 Iowa 283, 85 N.W. 85, 88; Baker v. Mathew, 1908, 137 Iowa 410, 115 N.W. 15, 17; Kelty v. McPeake, 1909, 143 Iowa 567, 121 N.W. 529, 530; Skeels v. Porter, 1914, 165 Iowa 255, 145 N.W. 332, 335; Peterson v. McManus, 1919, 187 Iowa 522, 172 N.W. 460, 466.

now before us were "clearly erroneous", that is, whether, although there is supporting evidence, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed", United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218, or whether "they are based upon a substantial error in the proceedings or upon a misapplication of the controlling law, or if they are unsupported by any substantial evidence, or if they are contrary to the clear weight of all the evidence". Kauk v. Anderson, 8 Cir., 1943, 137 F.2d 331, 333. See Pendergrass v. New York Life Ins. Co., 8 Cir., 1950, 181 F.2d 136, 138.

 After a careful review of the entire record, we agree with the district court (a) that the referee's finding that the evidence did not establish that the bankrupt did not intend to pay for the merchandise was not clearly erroneous, (b) that materially false statements were knowingly submitted to Endicott by the bankrupt, (c) that the referee's finding that Endicott did not rely on the statements was clearly erroneous, and (d) that under Iowa law rescission was in order here, and was effected, and as a consequence the petition for reclamation must be granted.

We therefore need not dwell on the factor of intent to pay. We consider only material falsity, the bankrupt's knowledge thereof, and Endicott's reliance.

*Material falsity.* The material falsity of the bankrupt's fiscal 1957 and 1958 balance sheets by way of substantial and material understatement of accounts payable has been stipulated and thereby established.

*Knowledge.* That the bankrupt, through Woerderhoff, its President and Treasurer, who had operated the business as a corporation for a number of years, had actual or legally presumed knowledge of that falsity at the time the statements were submitted to Endicott seems to us to be an inescapable conclusion. The only evidence which we find in this record tending to support a lack of knowledge on the part of the bankrupt of the falsity of the statements is the answer to the following question propounded to Mr. Woerderhoff on redirect examination:

"Question: When you prepared these financial statements, did you believe at that time they were true and correct? Answer: Yes, I did."

This was followed immediately, on recross, by:

"Question: Mr. Woerderhoff, how did you arrive at the figure of $21,-476.10 accounts payable in that statement? Answer: Just by guessing at it, I guess."

The Trustee argues that this testimony shows lack of knowledge of the falsity; that the 1958 accounts payable figure of $21,476.10 is the very one which appears on the balance sheet contained in the bankrupt's fiscal 1958 federal income tax return prepared and filed some time before the submission of the 1958 statement to Endicott; and that there could be no reason for the bankrupt's intentionally understating its accounts payable on the tax return because that would result in showing the business to be better off than it was and would work to its tax disadvantage.

We are not convinced by this income tax return fact or this argument. We are impressed, instead, with the facts that Woerderhoff himself gave the 1958 accounts payable figure to the accountant; that he was aware since his son's death in 1953 of the business' "staggering load in debt"; that the accounts payable figure in the fiscal 1957 statement was also understated and was delivered to Endicott before the fiscal 1958 tax return was prepared; that these financial statements contained specific to-the-penny figures and did not purport to be estimates; that the 1958 figure was "guessed at"; that in March 1958 Woerderhoff had stated orally to Endicott's divisional credit

manager "things were in pretty good shape"; that, in order to continue operating, the great need of the business was for merchandise; that with merchandise Woerderhoff felt "this thing would work itself out"; that the statements were submitted in order to obtain merchandise and credit; that in early October 1958 Woerderhoff wrote Endicott that "We anticipate no more difficulty at the South Side Store. Neither would we have had here (uptown store) had we received our men's shoes as promised"; and at the time of the bankruptcy, and for 30 days before, the bankrupt had obligations of $59,000. These facts nullify and make unworthy of belief Woerderhoff's assertion that at the time he prepared the financial statements he believed them to be true and correct. Furthermore, the critical time is not when they were prepared but when they were submitted to Endicott and the critical feature is not whether he believed them to be true but whether he was justified in any such belief.

In Baker v. Bockelman, 1929, 208 Iowa 254, 225 N.W. 411, 412, it was said:

"It is the settled law in Iowa that one who asserts, as a fact, without qualification, something that he does not know to be true, asserts, by implication at least, the thing asserted is of his own knowledge, and true, and he is not permitted, as against one to whom the representation is made as an inducement to act, and who is thereby induced to act, to thereafter assert that he did not know his statement to be false."

And in Dimond v. Peace River Land & Development Co., 1918, 182 Iowa 400, 165 N.W. 1032, 1035, it was said:

"When one asserts a fact to induce action on the part of another, it is rightly assumed that he has knowledge of the fact about which he makes the positive assertion, and, when acted upon, cannot be heard to say that he did not know the fact was untrue at the time he asserted it, and escape liability."

The Iowa court has also said that "scienter may be proved by showing * * * that the special situation or means of knowledge of the representer were such as to make it his duty to know as to the truth or falsity of the representation". Boysen v. Petersen, 1927, 203 Iowa 1073, 211 N.W. 894, 897.[7]

The bankruptcy discharge cases are also authority here. Material falsity, within the meaning of § 14, sub. c of the Bankruptcy Act, 11 U.S.C.A. § 32, sub. c, of a written statement of financial condition has been held to imply more than mere incorrectness. But the definition is met where the statement

" * * * was made and acquiesced in either with actual knowledge that it was incorrect, or with reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct". Morimura, Arai & Co. v. Taback, 1929, 279 U.S. 24, 33, 49 S.Ct. 212, 215, 73 L.Ed. 586.

Thus, in the cited case, a bankrupt's discharge was denied, even though he "stated generally that the statement * * * was correct to the best of his knowledge", p. 31 of 279 U.S., p. 214 of 49 S.Ct. To the same effect are In re Santos, 7 Cir., 1954, 211 F.2d 887, 889, (where an experienced but illiterate bankrupt, who signed a financial statement, claimed that he did so without knowledge of its falsity); Industrial Bank of Commerce v. Bissell, 2 Cir., 1955, 219 F.2d 624, (where a bankrupt's omission of a note payable was apparently due to his belief that the holder would not enforce it); David v. Annapolis Banking & Trust Co.,

---

7. See also Hills Sav. Bank v. Cress, 1928, 205 Iowa 306, 218 N.W. 74, 77; Morris v. Posner, supra, 111 Iowa 335, 82 N.W. 755; Sternberg v. American Snuff Co., 8 Cir., 1934, 69 F.2d 307, 309; In re Monson, W.D.Ky., 1955, 127 F. Supp. 625, 626.

4 Cir., 1953, 209 F.2d 343, (where a bankrupt relied upon her husband's preparation of the financial statement); In re Barbiere, E.D.Pa., 1951, 97 F.Supp. 86, aff'd 3 Cir., 192 F.2d 1018, (where a bankrupt stated falsely that he was the owner of certain real property and justified his statement because "you take it for granted" and he did not intend to deceive anyone). It has also been said that a "bankrupt's unsupported assertions of an honest intent will not overcome the natural inferences from admitted facts". Collier on Bankruptcy (14th Ed.), Vol. 1, Par. 14.40, pp. 1372, 1374.

We are therefore satisfied that the bankrupt knowingly submitted to Endicott materially false statements. Woerderhoff's claimed belief in the correctness of the statements and in a successful prognosis for the bankrupt do not permit, under the circumstances here, a contrary conclusion.

*Reliance.* The referee ended his order with the finding that Endicott "actually did not rely upon the financial statements in extending the credit to the bankrupt". Earlier in the same order he stated that in his opinion Endicott "did not entirely rely upon the financial statements". We think that reliance, or at least partial reliance, is conclusively demonstrated.

There is clear and specific testimony by both Endicott's divisional credit manager and its general credit manager that the statements were used to establish the amount of credit to be extended. Woerderhoff admitted that it was the custom of shoe manufacturers to require the submission of financial statements as a basis for credit. He also said that his business ran on a fairly even keel until May or June of 1958 when he experienced increasing difficulty in making payments to keep his creditors satisfied. It was Endicott's general practice to obtain financial statements every year if possible. The 1958 statements were specifically requested. The credit limitation specified for the bankrupt was responsive to the annual statements.

The thrust of the Trustee's argument, namely, that the shipments in question, particularly those in September 1958 and thereafter, were made only as a result of the bankrupt's checks clearing and its being placed, in effect, on a cash basis, and were not made in reliance on the statements and that no additional credit, beyond that already allowed, was extended because of them, overlooks the nature of the budget plan. The shipments were still grounded on the established credit of approximately $8,500, an amount determined by and dependent on the statements. This is not any less so because the bankrupt's debt to Endicott remained about the same as it was before the submission of the 1958 statement. The argument also loses sight of the additional falsity of the 1957 statement, the fact the 1958 credit might not have been extended at all had the statements been correct, and the fact that attempts forthwith to collect the entire amount might have been instituted in the meantime and without the extension of further credit.

The remaining facts that Endicott sought Woerderhoff's personal guaranty, that it took checks from the bankrupt in September 1958, and that it was aware that a retail shoe business' condition can vary from month to month, and the hearsay testimony, if properly admitted, as to the surprise of one of its salesmen who had not seen the statements that credit had been extended, are not inconsistent with Endicott's reliance on the financial statements. Because the bankrupt's retail shoe operation was, and was known to be, a narrow one, it demanded, as a practical matter, continued alertness on the part of the supplier. Endicott's quest for additional security, although unsuccessful, enhances rather than detracts from the substantive importance here of the correctness of Woerderhoff's financial statements.

The Trustee cites In re Braverman, S.D.N.Y., 1912, 199 F. 863, as a similar situation and as a holding that a seller has no right to rely on a financial statement as old as the ones involved here.

We feel that that case is distinguishable on its facts for Judge Learned Hand emphasized the bankrupt's failure to fill in a blank, present in the statement, showing how long it was to be regarded as continuing. That case has been described as one where actual reliance was not shown. In re Wylly, E.D.N.Y., 1913, 210 F. 954, 957. And, in any event, if Braverman is not distinguishable on its facts, its force and effect seem to be nullified by Gerdes v. Lustgarten, 1924, 266 U.S. 321, p. 45 S.Ct. 107, 69 L.Ed. 309, where the court held, p. 326, that lapse of time is only material in determining whether credit was extended within the period intended and upon the faith of the statement; the court accordingly reversed a Second Circuit holding that, irrespective of the question of falsity and reliance, a discharge should be granted on the theory that the creditor was not justified in relying upon the statement. Here, as we have concluded, we have reliance and justified reliance. Compare P. Cox Shoe Mfg. Co. v. Adams, 1898, 105 Iowa 402, 75 N.W. 316, 320, where the lapse of almost a year from the time a statement was made was held not to prevent rescission.

We therefore conclude, as did the district court, that the referee's finding that Endicott did not at least partially rely upon the false financial statements is unsupported by any substantial evidence and is contrary to the clear weight of all the evidence and that his conclusion that legal fraud justifying rescission was not conclusively shown is a misapplication of the controlling Iowa law. We are left "with the definite and firm conviction that a mistake has been committed". The referee's findings were therefore "clearly erroneous" and the district court's holding that Endicott is entitled to reclamation is right.

While we realize that a decision in favor of Endicott has the practical effect, as pointed out by the Trustee in its argument, of favoring one creditor over the general creditors, this is necessarily true of any successful reclamation petition.

It would be unjust to permit general creditors to benefit at the expense of one whose assets come into a bankrupt's possession under conditions which warrant rescission.

Affirmed.